UNITED STATES of America,
Appellee,

v.

Ernest O. D. CAMPBELL, Defendant-
Appellant.

No. 473, Docket 29463.

United States Court of Appeals
Second Circuit.

Argued May 5, 1965.

Decided Sept. 28, 1965.

Richard A. Givens, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City, David M. Dorsen, Asst. U. S. Atty., Southern District of New York, of counsel), for appellee.

Leon Silverman, New York City (Strasser, Spiegelberg, Fried & Frank,

Victor S. Friedman, New York City, Stephen Fraidin, Brooklyn, N. Y., Daniel C. Schaffer, New York City, of counsel), for defendant-appellant.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge.

The defendant, Ernest O. D. Campbell, appeals from a judgment of conviction, after a jury verdict, on five counts of an indictment charging him with a wilful attempt to evade United States income taxes for 1955 through 1958 in violation of Section 7201 of the Internal Revenue Code of 1954 (the Code) (counts I–III and V) and on one count alleging that he had made a wilful false statement on his 1957 federal tax return in violation of Section 1001 of the Code (count IV).

Campbell, a United States citizen, moved to Canada in 1945. His conviction arises from his treatment of the United States income tax aspects of several stock transactions: (1) failure to report profits of approximately $1,194,394.75 in 1955 and $117,833.74 in 1956 from the sale of his large blocks of stock in Campbell-Chibougamau, Ltd., a Canadian mining corporation which Campbell had helped to form (counts I and II); (2) failure to report the receipt in 1957 of some $3,000 (count III); (3) the false report of a "sale" to his wife of Ford Highwood Collieries, Ltd. stock for $19,-657.91, which Campbell and his wife had purchased originally in 1956 for $133,000 (count IV); and (4) the false report of a "loss" on this sale of $112,000 of the original purchase price of the Ford Highwood Collieries, Ltd. stock as a carry-over deduction on his income tax return for 1958 (count V).

*Citizenship*

Campbell in August 1956 best describes his own status to the Canadian Department of National Revenue: "I am, and always have been a citizen of the United States, and whatever income I earned in Canada, I included in my returns for the aforementioned years

[1954–1955], which I filed in New York," and specifically for 1955 "In 1955, the taxpayer [Campbell] was and still is a non-resident of Canada, being domiciled in the State of New York, U. S. A."

*1955*

As a citizen of the United States and a resident of New York State, Campbell was under a legal obligation to file a federal income tax return for 1955. He did so, reporting an adjusted gross income of $8,859.99 but failed to report long-term capital gains of $845,056.60, arising primarily from sales in the United States and Canada of stock of Campbell-Chibougamau Mines, Ltd. owned by him. Upon a recomputation of the tax due, the Government calculated that the true adjusted gross income should have been $433,910.99. The Government alleged a tax deficiency of $237,835.59 of which it proved $211,277.15.

Campbell had long been well versed in figures, first as a bookkeeper in Wall Street and then as a stock broker for some 30 to 35 years. He did not report his huge capital gains because he regarded them as resulting from Canadian transactions. Under Canadian law, there was no tax on capital gains. When it served his tax convenience, Campbell was a resident of Canada and, when Canada approached him with the suggestion of paying taxes there, he quickly signed whatever statements were necessary to proclaim that he was a non-resident of Canada and domiciled in New York. These statements (a "form" he called it) he attributes to his lawyer anxious to defend him against a Canadian tax.

Campbell upon this appeal does not contest his wilful failure to include large amounts of income (capital gains) in his return but bases his case here, as he did throughout the trial, on the claim that actually and in retrospect Canadian tax assessments for the years 1955 and 1956 should be regarded as taxes paid or accrued during the taxable year to a foreign country and, hence, a deduction under the tax form item "8. Tax credits * * * (a) Credit for income tax payments to a foreign country or U. S. possession (Attach Form 1116)." Thus, argues Campbell, if the Canadian assessment qualifies for the credit under the category "paid or accrued" (which he asserts it does) then any United States tax is wiped out. His conclusion is that no matter how fraudulent and wilful were his efforts to cheat both countries of any tax on his huge gains, he cannot be convicted of evading or defeating a tax which never came into being.

Despite his detailed arguments, however, Campbell is not entitled to the credit and his convictions on counts I and II of the indictment must be affirmed on the basis of deficiencies in his reported tax for 1955 and 1956.

■ Section 905(a) of the Code determines when the credit may be taken and allows the taxpayer an election between the cash or accrual method of reporting. The United States credit for an uncontested foreign tax of course applies to the year in which the foreign tax was levied. In the event the foreign tax is contested by the taxpayer, the Internal Revenue Service has followed Cuba R. R. v. United States, 124 F.Supp. 182 (S.D.N.Y.1954), which requires a taxpayer on an accrual basis to accrue a foreign tax liability as a credit against United States tax in the year in which this liability has been finally determined. However, this accrual has been allowed to "relate back" to the year in which the foreign tax was levied. Rev.Rul. 58–55, 1958–1 Cum.Bull. 266. Thus, if the taxpayer contests his liability for a foreign tax imposed on income in 1960, and this liability is finally adjudicated in the foreign country in 1965, "the credit may not be claimed until 1965 * * *, [but] the foreign tax imposed on 1960 income will be offset against the United States 1960 tax just as if it had accrued in 1960." Owens, The Foreign Tax Credit 5/3B2, at 328 (1961).

■■ For the Government's case it was only necessary to establish that Campbell had received unreported income and that this non-disclosure had resulted in a tax deficiency. Elwert v. United States, 231 F.2d 928, 931 (9th Cir.

1956); United States v. Bender, 218 F.2d 869 (7th Cir.), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955). In the present case, the Government established non-disclosure and at least the *prima facie* existence of a deficiency. At this point Campbell had the burden of going forward to negate the deficiency by showing that it was wrongly computed or was cancelled by another deduction or credit not yet allowed. Elwert v. United States, supra; United States v. Bender, supra.

Moreover, the foreign tax credit is "an act of grace on the part of Congress, and one who seeks the benefit of its provisions must plainly establish his right by showing that he has fulfilled all the conditions upon which the allowance of the credit is made to depend." Irving Air Chute Co. v. Commissioner of Internal Revenue, 143 F.2d 256, 259 (2d Cir. 1944). In this context, the District Court correctly held that Campbell was not entitled to the foreign tax credit since he failed to make full and timely disclosure of his income from the Campbell-Chibougamau transactions and failed to enter a timely claim for the credit.

Section 905(b) of the Code establishes the manner in which the credit may be claimed and provides that a foreign tax credit will be allowed only if the taxpayer "establishes to the satisfaction of the Secretary [of the Treasury] or his delegate" the "total" amount of his foreign income, the foreign tax paid on that income, and "all other information necessary for the verification and computation" of the credit. In addition, section 905(c) gives the Secretary or his delegate discretion to require a bond from a taxpayer-claimant, whose foreign tax has accrued but has not yet been paid, to stand as security in the event the taxpayer later receives a refund under foreign law. The statute thus clearly indicates that a claim for the credit must be made promptly and that full disclosure of *all* foreign income must be made in the taxpayer's initial *return* or by a prompt amendment. Hy-

gienic Prods. Co. v. Commissioner of Internal Revenue, 111 F.2d 330 (6th Cir.), cert. denied, 311 U.S. 665, 61 S.Ct. 22, 85 L.Ed. 426 (1940); United Dyewood Corp. v. Bowers, 44 F.2d 399 (S.D.N.Y. 1930), aff'd per curiam, 56 F.2d 603 (2d Cir. 1932). Nor does the statute distinguish between contested foreign tax levies and those which become final immediately.

This construction of the statute gains further support from Revenue Ruling 58–55. The retroactivity established in the Ruling seems to depend on timely and full initial disclosure of all foreign income. It would be contrary to the purpose of sections 901–905 to grant a credit against United States tax on income not concurrently taxed by a foreign government. It would be anomalous to allow criminal responsibility under United States law for an otherwise consummated crime to depend absolutely on the subsequent and possibly fortuitous imposition of tax liability under foreign law. Willingham v. United States, 289 F.2d 283 (5th Cir. 1961), cert. denied, 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 31 (1961).

Campbell (in his brief) states well and succinctly the purpose of the foreign tax credit statutes, § 901, et seq., as follows:

"The purpose of the foreign tax credit is to prevent double taxation of income which United States citizens earn abroad. Since the United States may and in most cases does tax its citizens on all of their income, wherever earned, those who earn income in foreign countries subject to foreign income tax may be subjected to the burden of double taxation."

However, after this statement he completely ignores the provisions of the statute as to how the credit is to be obtained. The credit in an income tax sense must be a credit against another tax on the same item if double taxation is to be avoided. If Campbell, for example, had reported his stock gains on his 1955 United States return and had shown a tax thereon of $200,000, he could have

claimed any Canadian tax thereon paid or accrued as a credit under item "8. Tax credits." But Campbell wholly failed to disclose the gain or any tax thereon against which a Canadian tax could have been a credit. Nor did he make any disclosure to the Canadian authorities. Campbell was not seeking to avoid double taxation. Rather, by concealment and playing one country against the other, he sought to avoid any taxation whatsoever on his large stock profits.[1] Now that his scheme has failed, he would have the courts on a *nunc pro tunc* basis rewrite his 1955 return as if he had reported his capital gains, calculated the tax thereon, had paid, or accrued on his books, a Canadian tax and had complied with the other requirements prescribed by law for the consideration and possible allowance of the claimed credit.

■ The Canadian document which he now offers to the effect that an appeal has been dismissed "for the reason that the assessment is deemed to be valid until the contrary is proven" falls far short of proving a Canadian tax paid or accrued on the proceeds of the stock sales. Since payment of the tax subsequent to the acts of evasion is no defense to prosecution therefor, United States v. McCormick, 67 F.2d 867, 870 (2 Cir. 1933), cert. denied, 291 U.S. 662, 54 S.Ct. 438, 78 L.Ed. 1054 (1934), so much the less should be this belated attempt to advance a credit theory, (withheld even to the third day of the criminal trial) when no proof of payment, accrual or offer of payment was proffered. Only now is this court asked to take judicial notice of certain Canadian certifications annexed as an appendix to appellant's brief. Even were the court to do so, they would not satisfy the statutory requirements for a foreign tax credit.

■ The determination of criminal liability is the real issue at stake in the present case and not merely the question of Campbell's right to a foreign tax credit in a civil case. Nevertheless, the requirements of section 905 should not be construed as mere technicalities and thus disregarded since the credit could then be used as a device to create a haven for federal tax evasion. Under Campbell's construction of section 905, a United States citizen doing business abroad would merely be required to pay taxes already owed when and if the United States became aware of an irregularity in his tax return. A taxpayer in Campbell's position could not lose by his attempted evasion since he would be required merely to pay foreign taxes due (which he had heretofore avoided) immediately and without protest once he sensed that Internal Revenue was on his trail. In the alternative, the foreign tax could be paid or admitted immediately (as Campbell states was the case for his Canadian liability for 1956) and a claim for the United States tax credit could be entered when the Internal Revenue Service became suspicious that foreign income had not been declared. He would then claim that the foreign tax had accrued within the meaning of the 1954 Code and that he was entitled to

---

1. The facts of the present case indicate that such a gambit may have been attempted by Campbell. He never filed a United States return from 1945 through 1953. He also replied as follows to Canada's initial claim for taxes for 1954 and 1955:

Department of August 22, 1956.
 National Revenue
Tax Division
400 Youville Square
Montreal, Canada
Gentlemen:
 I was surprised to find your Tax Returns for the years 1954–55 awaiting my return to Montreal.

As you probably already know, I am, and always have been a citizen of the United States, and whatever income I earned in Canada, I included in my returns for the aforementioned years, which I filed in New York.
 If there is any further information you desire, please be good enough to communicate with me.
 Respectfully yours,
 Ernest Campbell

the retroactive credit as an absolute defense. The relief from double taxation provided by Congress was obviously not meant as an incentive to encourage such reluctant taxpayers to conceal their income from both countries in the hope that their omission would be entirely overlooked. A prompt opportunity must be presented for the Government to determine the taxpayer's total foreign income and whether a credit will be allowed on the full amount of the income.

Campbell presented only two items of evidence to the District Court to establish his right to the credit: (1) a stipulation of fact between the parties which Campbell contends admitted that his Canadian liability had become final in 1961; and (2) a determination of his Canadian income tax for these years as set out in notices of the assessment of Canadian tax deficiencies.

 Campbell presented no proof that these transactions took place in Canada. In fact, there is some indication in the record that some of these sales were actually made in New York. Campbell also adduced inadequate proof that his Canadian tax liability for 1955 and 1956 had been finally determined. The District Court correctly excluded the stipulation of fact as inconclusive and irrelevant since it was vaguely worded and said nothing specific about Campbell's tax liability for the years in dispute. The 1955 Canadian assessment notice does not constitute sufficient evidence of a final determination for that year since Campbell admits that he contested this tax assessment. Proof of his right to a credit in 1955 depends instead on an authenticated copy of a final Canadian judgment or other proof that the Canadian contest had been resolved. Campbell's 1956 Canadian assessment appears to have been uncontested but he never offered proof to the District Court that this assessment had in fact become final under Canadian law through his failure to enter an objection within the specified time. However, even accepting these assessments as beyond contest in Canada as assessments,

they do not satisfy the "paid or accrued" requirement of our tax laws.

 Campbell urges this Court to take judicial notice of several items of evidence of Canadian law, particularly relevant to 1955, which he presents for the first time on appeal. However, judicial notice should not be used as a device to correct on appeal an almost complete failure to present adequate evidence to the trial court.

 Campbell's arguments against the remaining counts of the indictment lack substance once his convictions on counts I and II are upheld. He argues as to count III that the Government erred in the transcription of bond transactions from brokerage lists to its summaries of these records offered in evidence and that the original records show that he had in fact purchased rather than sold 3% Government of Canada bonds in 1957 which would make it impossible for him to have received the interest as charged or to have declared it in 1957. However, as the Government notes in its brief, the transaction as shown on the original brokerage records could just as easily reflect the sale of the 3% bonds *from* Campbell to the broker and then *to* another customer. Furthermore, Campbell's contention that the Government's exhibits were transcribed in error was apparently not raised below and at best this issue was resolved against him by the jury.

Finally, Campbell argues that his revaluation and "sale" of his Ford Highwood Collieries stock was made in good faith and on the advice of his accountant. Campbell's characterization of his intent was obviously disbelieved by the jury. This was a reasonable finding in view of the details of the series of transactions involving the stock and of the pattern created by Campbell's reporting of his income for 1955–57. Furthermore, he offered no concrete evidence that he had consulted with an attorney concerning the Ford Highwood stock transaction or that he had made a full and frank disclosure of all the facts to counsel, even assuming that such legal or accounting

advice was obtained before consummation of the transaction.

The facts relating to the purported sale of Campbell's Ford Highwood stock to his wife and the 1957 loss claimed thereon are so clearly fraudulent that they call for this conclusion. Even as Campbell would place the blame for his tax derelictions upon his lawyer, so here does he endeavor to charge his accountant with improper advice. The proof is convincing as to the person responsible. The jury's verdict indicates that person.

Affirmed.

HAYS, Circuit Judge.

I concur in the result.