EDWIN PROBBER and ELLEN PROBBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Probber v. Commissioner
Docket No. 25669-82.
United States Tax Court
T.C. Memo 1985-193; 1985 Tax Ct. Memo LEXIS 439; 49 T.C.M. (CCH) 1272; T.C.M. (RIA) 85193; April 22, 1985. James A. Pascarella, for the petitioners. Jody Tancer and David Goldberg, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In a statutory notice *440 of deficiency dated July 28, 1982, respondent determined deficiencies in petitioners' Federal income taxes of $12,977.30 for 1972 and $9,840.70 for 1973. Respondent also determined additions to tax under section 6653(b), [1] against petitioner Edwin Probber only, of $6,488.65 for 1972 and $4,920.35 for 1973. By an Amendment to Answer to conform to proof at trial, respondent seeks additional deficiencies in income tax in the amounts of $247.75 and $231.59 against petitioners and additions to tax in the amount of $123.88 and $115.80 against petitioner Edwin Probber for the years 1972 and 1973, respectively. Unless respondent has established fraud, the deficiencies determined by respondent are barred by the statute of limitations. In determining whether or not fraud has been shown, and in deciding whether respondent's determination of the deficiencies is correct, if fraud is shown, we must decide whether unreported gross income of petitioner Edwin Probber was used to pay deductible expenses and whether certain receipts were income *441 of petitioners or of their solely owned corporation. Finally, if we find fraudulent conduct on the part of petitioner Edwin Probber, we must determine whether petitioner Ellen Probber qualifies as an innocent spouse under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation is incorporated herein by this reference. Petitioners were residents of Garden City, New York, at the time they filed their petition herein. They filed joint individual tax returns for the years 1972 and 1973. During the years in issue, petitioner Edwin Probber (petitioner) was a practicing podiatrist. He attended Long Island University, St. Johns University, and the First Institute of Podiatry. He received a Doctor of Podiatry degree and a honorary doctorate of ambulatory foot surgery. He published articles in the area of podiatry and developed some of the procedures and equipment used in ambulatory foot surgery. Beginning in 1957 and in 1972 and 1973, in addition to his podiatry practice, petitioner taught classes for practicing podiatrists. As of 1972 and 1973, he had taught in excess of 1,500 students. Each student paid petitioner a fee of $350. The total *442 amount of student fee income received by petitioner was $34,425 in 1972 and $24,800 in 1973. Petitioner kept no books and records with respect to his income from his podiatry practice or his income from teaching. Petitioners' tax returns for 1972 and 1973 were prepared by Henry Schoenfeld (Schoenfeld), a certified public accountant, from information provided to him by petitioner.The income reported on those tax returns, on Schedule C thereof, for 1972 and 1973 was based upon deposits to petitioner's checking account at the Franklin National Bank (FNB), reduced by patient refunds and increased by an amount petitioner identified as cash, received from patients or from cashing checks, on hand as of the end of the tax year. The amounts thus reported by petitioner on his tax returns as gross receipts from his practice for the years in issue were as follows: 1972
1973
Deposits into FNB
$76,358.21 $75,769.45 Refunds
(2,285.66)
(2,224.83)
Cashed Checks
3,600.00 Cash Receipts
2,600.00 1,300.00 Total
$76,672.55 $78,444.62 Petitioner also maintained a bank account at Valley National Bank. During 1972 and 1973, petitioner received checks *443 for student fees that were either cashed or were deposited into Valley National Bank. These fees were not reported on petitioner's income tax returns. The total unreported student fees were not less than $23,387 in 1972 and $14,550 in 1973. Petitioner prepared lists of Schedule C expenses to be claimed on his 1972 and 1973 tax returns and provided those lists to Schoenfeld.On each list was an item labeled "Student Subsistence," which represented food and drink provided by petitioner to his podiatry students. The amounts thus claimed were $7,075.50 in 1972 and $7,972.26 in 1973. These expenditures were substantiated, primarily by records of credit transactions. After audit of petitioner's tax returns, respondent allowed these amounts as deductions from petitioner's income. Although at trial of this case petitioner claimed that the cash received by him from negotiating checks for student fees was also spent for food and drink for his students, he failed to substantiate any expenditures for that item in excess of the amounts allowed by respondent. Prior to January 1975, petitioners' tax returns for 1972 and 1973 were assigned to George Ricci (Ricci), a revenue agent, for examination. *444 Petitioner signed a power of attorney authorizing Schoenfeld to act for him in relation to the audit. Between January 1975 and December 1975, Ricci had several conferences with petitioner and Schoenfeld together and with Schoenfeld separately, reviewed FNB deposit records by obtaining them from FNB, and attempted to secure from petitioner or Schoenfeld an explanation of the discrepancy between the total student fee income received and the fee income deposited into the FNB account. Neither petitioner nor Schoenfeld provided an explanation to Ricci. Schoenfeld did give Ricci a list of the doctors who had been students in petitioner's courses during 1972 and 1973. In December 1975 Ricci referred petitioners' 1972 and 1973 tax returns to the Criminal Investigation Division of the Internal Revenue Service. Special Agent Michael Litterelle (Litterelle) was assigned to conduct the investigation.In January and February 197 6, Litterelle circularized the doctors who had attended petitioner's course in 1972 and 1973 by writing to each of them and requesting information concerning payments made to petitioner. In response to the circularization, Litterelle obtained copies of canceled checks *445 used in making payments to petitioner. Litterelle then prepared a schedule containing the names of the students, the date and amount of each check used to pay for petitioner's course, and the disposition, whether cashed or deposited and at what bank, of those checks. In February 1976, Litterelle wrote a letter to petitioner requesting a meeting and that petitioner bring with him to such meeting all of his records concerning his income-producing activities, personal bank accounts, and brokerage statements. Petitioner telephoned Litterelle and requested a postponement of the meeting because he needed additional time to gather his records. Petitioner also stated to Litterelle that his patient fee schedules were in code and that it would take some time for him to translate them. On March 23, 1976, Maxwell Richman (Richman) submitted a power of attorney signed by petitioners authorizing Richman to represent petitioners with respect to the tax years 1972 and 1973. At a meeting in March 1976, Litterelle advised Richman that there was a criminal investigation pending with respect to petitioners' 1972 and 1973 tax returns, specifically in reference to approximately $20,000 of unreported *446 income in each year. Ricci and Litterelle met with Richman again in May 1976. At that time, for the first time, Richman stated that petitioner had additional expenses that would offset the unreported income. Richman stated that petitioner had diaries that would substantiate the additional expenses and that Richman would make the diaries available to the agents after he had inspected them. Although he subsequently met with Ricci and Litterelle in June and July 1976, Richman never provided Ricci or Litterelle with diaries or any other records substantiating the claimed offsetting expenses. No such records were ever provided to respondent. Petitioner destroyed any records that had previously existed subsequent to his acquittal by a jury in 1979 of criminal charges resulting from Litterelle's investigation. During the meeting with Litterelle and Ricci in May 1976, Richman stated to the agents that petitioner had maintained separate checking accounts into which checks were deposited in relation to conclaves conducted for podiatrists at Key Biscayne, Florida, and Puerto Rico in 1972 and 1973. The conclaves were organized and run by petitioner and were attended by former students *447 of petitioner and by Mrs. Probber. Petitioners did not pay for their own expenses of attending the conclaves. Each student paid a fee for the conclave. Petitioner maintained sole signatory power and control over the accounts. The total deposits by petitioner into the conclave bank accounts were $37,240 in 1972 and $71,106 in 1973. Disbursements from the conclave bank accounts for deductible expenses were $34,867.36 in 1972 and $63,940.56 in 1973. Certain disbursements were identifiable as personal expenditures for the benefit of petitioners in 1973; those items totaled not less than $1,463.86. The balance of disbursements from the conclave bank accounts during 1972 and 1973 were unaccounted for. Petitioners did not explain how their personal expenses at the conclave sites were paid. During trial of this case, petitioner claimed that unaccounted for disbursements represented by missing checks were honorariums paid to certain speakers at the conclaves, but he produced neither corroborating testimony nor documentary evidence to support his claim. Interrogatories served on petitioners by respondent prior to trial called for information that would have disclosed this claimed use *448 of the unaccounted for funds. Petitioner did not provide this explanation in response to those interrogatories or at any time prior to his testimony at trial. During 1972 and 1973, petitioner received payments from Mayflower Podiatry Supply Co. (Mayflower) and A Town and Country Press as compensation for petitioner's referral of his podiatrist-students to those companies, which provided podiatry supplies and printed forms. During 1972 and 1973, Mayflower made payments for these referrals of business by petitioner in the total amount of $3,500 in 1972 and $4,100 in 1973. Pursuant to petitioner's instructions, the payments were made by checks payable to Barscott Realty, a corporation solely owned by petitioners and engaged in real estate. Barscott realty owned the building in which petitioner maintained his podiatry practice and conducted his courses. A Town and Country Press paid $495.50 in relation to business referrals in 1972. That amount was paid by check payable to petitioner, which petitioner cashed at the Valley National Bank and did not report on his 1972 tax return. A Town and Country Press paid $482.50 for these referrals in 1973. In accordance with petitioner's *449 instructions, that payment was made by check payable to Barscott Realty and deposited in the corporate account. Barscott Realty reported on its corporate tax returns the payments made by Mayflower in 1972 and 1973 and the payment made by A Town and Country Press in 1973. Petitioners did not report any income from these sources on their individual tax returns. In addition to the unreported income described above, respondent determined that petitioners had failed to report on their tax returns for the years in issue amounts of $301.55 and $435.45, respectively, earned on bank accounts held by petitioners in trust for their children. Respondent also disallowed certain Schedule C expenses claimed by petitioners for lack of substantiation. Automobile expenses claimed were disallowed because they were for personal use. Petitioner and Mrs. Probber, at the time of trial, had been married and had lived together for approximately 35 years. Mrs. Probber was aware of all of her husband's income-producing activities during the years in issue. She attended the podiatry conclaves with petitioner in Florida and Puerto Rico in 1972 and 1973, respectively. She was an officer of Barscott *450 Realty and signed the 1973 corporate income tax return for Barscott Realty. She received compensation from Barscott Realty in 1973. ULTIMATE FINDINGS OF FACT Petitioner had substantial amounts of unreported income during 1972 and 1973, and an underpayment of tax resulted in each year. Petitioner's explanation of his failure to report the unreported income from student fees and conclaves is uncorroborated and not credible. The parts of the underpayment attributable to those items are due to fraud on the part of petitioner Edwin Probber. Petitioner Ellen Probber was aware of the sources of unreported income of petitioner during the years in issue and benefitted from them. It is not inequitable to hold her liable for the deficiencies in tax. OPINION Section 6501(a) generally provides that an income tax must be assessed within 3 years after the filing of a return or the due date for the return, whichever is later. Section 6501(c)(1) provides for an exception to the general period of limitations in the case of a fraudulent return. Respondent's burden of showing that he comes within the exception to the period of limitations is the same as that which he bears in sustaining *451 the addition to tax for fraud under section 6653(b). Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3d Cir. 1967); Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. 988, 996 (1963). The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment for each year was due to fraud. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The existence of fraud is a question *452 of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The intent to conceal or mislead may be inferred from the pattern of conduct. See Spies v. United States,317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States,348 U.S. 121, 137 (1954); Otsuki v. Commissioner,supra.Such additional circumstances, or badges of fraud, include inadequate or nonexistent records. Estate of Mazzoni v. Commissioner,451 F.2d 197, 202 (3d Cir. 1971); *453 Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); Otsuki v. Commissioner,supra.Compare United States v. Procario,356 F.2d 614, 618 (2d Cir. 1966). Thus, proven substantial underreporting of income, dealing in cash, failing to maintain books and records, and withholding information from the accountant who prepared the taxpayer's return, taken together satisfy the Government's burden of proof. Once respondent presents clear and convincing evidence of unreported gross receipts, petitioner has the burden of proving his contention that his unclaimed deductible expenses offset those receipts. See Siravo v. United States,377 F.2d 469, 473 (1st Cir. 1967); United States v. Campbell,351 F.2d 336, 338-339 (2d Cir. 1965); United States v. Shavin,320 F.2d 308 (7th Cir. 1963); Elwert v. United States,231 F.2d 928, 931 (9th Cir. 1956). In this case, petitioner claims that he did not intend to defraud and that there was no understatement of his taxes because the unreported income was used for deductible business expenses. [2] Because his testimony is uncorroborated *454 by other witnesses or by documents, our resolution of this issue of fact depends on the credibility of petitioner. In the context of the entire record, petitioner's explanation is not credible and we need not accept it. See Greenfeld v. Commissioner,165 F.2d 318 (4th Cir. 1947). First, petitioner claims that most of the cash received from negotiation of checks for student fees was spent on buying food and drinks for the students. None of the students was called to testify to corroborate petitioner's statements that he spent thousands of dollars in cash on such entertainment. *455 Although during trial petitioner requested additional time to call former students as character witnesses, he did not produce any of those witnesses and never suggested that those witnesses would testify in corroboration of petitioner's testimony about expenditures of large amounts of cash to entertain them. Under these circumstances, we infer that those witnesses would not support petitioner's testimony. See National Labor Rel. Bd. v. Ford Radio & Mica Corp.,258 F.2d 457, 463 (2d Cir. 1958); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). [3] Further, petitioners claimed between $7,000 and $8,000 for student subsistence on their 1972 and 1973 income tax returns, most of which was substantiated by records of credit transactions. Petitioner asks us to believe that a multiple of those amounts was spent on unsubstantiated cash entertainment. We do not believe it. (A similar analysis applies to a less emphatic claim that some cash was spent on other business expenses, such as supplies.) *456 Second, petitioner's belated attempt to explain the unaccounted for disbursements from the conclave bank account is also not corroborated by evidence that, in the usual course, should be available. His vague testimony about a few honorariums does not account for the total of the unaccounted for items, and the fact that petitioners had personal expenditures in attending the conclaves that were not paid for by them justifies the inference that the unaccounted for disbursements were spent for petitioners' personal benefit. Third, the belated tendering of the "netting" (of income against expenses) explanation of the unreported income, the initial offering of substantiating diaries and later refusal to produce them, and the ultimate destruction of records, are not satisfactorily explained. Petitioner attempts to blame failure of communication among respondent's agents, Schoenfeld, Richman, and petitioner as the reason for his not earlier presenting his "netting" explanation. He denies that he ever had diaries of the nature referred to by Richman. Neither Schoenfeld nor Richman testified.Petitioner objected at trial on hearsay grounds to consideration of statements made by Schoenfeld *457 and Richman during the course of the investigation. Those statements were authorized admissions and were not hearsay. Rule 801(d)(2), Federal Rules of Evidence. Petitioner admitted that he never told Schoenfeld about the alleged expense items. Thus there is no contradiction of the agents' testimony concerning statements made to them by petitioner's representatives. Although petitioner was not required to present his personal records or diaries during the course of a criminal investigation, we are unpersuaded by his claim that he destroyed the records after his criminal trial because he believed that the matter was over. He has presented no reasonable basis for such a belief. He was represented by competent and experienced counsel, who must have known better. [4]
*458 Fourth, petitioner's overall credibility is in doubt. During his testimony, he denied knowledge of matters that he should have been keenly interested in, such as knowledge of the reasons he paid more taxes after an audit of his 1970 and 1971 returns. He claimed that during the years in issue he kept notes of cash received in the nightstand of his bedroom (apparently unbeknownst to Mrs. Probber) and destroyed them after making up the schedules for Schoenfeld. A person of petitioner's level of intelligence and education must have known that such conduct would preclude verification of his claims. We infer that it either did not take place or was intended to conceal petitioner's income. Petitioner's claim that the payments to Barscott Realty from Mayflower and A Town and Country Press were for rent is not worthy of belief. Petitioner originally testified that Mayflower exhibited its equipment on Barscott Realty premises and that representatives of Mayflower came to those premises to meet with the students. Only after a representative of Mayflower testified, however, did petitioner concede that students were transported to Mayflower, where Mayflower's sales efforts took place. *459 There is no evidence that the amounts paid had any relationship to the reasonable rental value of the premises. On the contrary, the payments were apparently related only to the amount of sales made by the payor to petitioner's students. Mrs. Probber, who was an officer of Barscott Realty, did not testify on this subject. Petitioner's testimony with respect to the payments made by A Town and Country Press was evasive and unconvincing: Q. Did you receive a percentage of the sales made by A Town and Country Press to your students in 1973? A. Our relationship was very, very, very friendly and I just depended on them giving me whatever they thought they should. It was a very friendly relationship. We always had good repartee with these people. Q. Did you, as the sole shareholder of Barscott Realty, charge them a set amount for rent in 1973? A. Really, not. No, I didn't. You see, these checks are for different amounts and there was no particular rental. Whatever he felt that I should get he gave me. Q. Dr. Probber, isn't it true that this check to Barscott Realty represents a percentage of the student -- of the purchases that the students made in 1973? A. What *460 is that now? Q. Dr. Probber, isn't it correct that this second check to Barscott Realty, in fact, represents a percentage of the purchases made by your students in 1973? A. I would say that is possible. They are different checks and he must have figured it out on a commission basis. Q. Dr. Probber, did you advise Mr. Jennings as to who to make these checks out to in each year? A. Well, when he started to rent out the second -- when the situation changed I did advise him to change the check to Town and Country -- I mean -- Barscott Realty. There is no evidence that any sales efforts of A Town and Country Press took place in a specific area of Barscott Realty's premises. None of the various indicia of fraud discussed above, standing alone, would compel the conclusion reached in this case. But on the basis of the entire record of petitioner's conduct and the lack of credibility of his excuses, we are satisfied that respondent has proven fraud by clear and convincing evidence and has thus satisfied the requirements of sections 6501(c)(1) and 6653(b). Petitioners have conceded the unreported interest income and have failed to carry their burden of proof with respect *461 to the deductions disallowed by respondent. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. The amounts of the deficiencies determined by respondent must, therefore, be sustained. Mrs. Probber claims that she is entitled to relief as an innocent spouse under section 6013(e). Under that section, among other things, she must establish that "taking into account all the facts and circumstances, it is inequitable to hold [her] liable for the deficiency in tas * * *." Section 6013(e)(1)(D). See Sonnenborn v. Commissioner,57 T.C. 373, 381-383 (1971). In the amendments to section 6013(e), adopted by the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, but made applicable to all pending cases, the Committee Report explained: "The bill does not specifically require that the determination of whether it would be inequitable to hold the innocent spouse liable include the consideration of whether such spouse benefitted from the erroneous item, but that factor should continue to be taken into account." H. Rept. No. 98-432, Supplemental Report Part. 2 at 1502 (1984). Petitioners had been married for *462 35 years and had continuously resided together during that period.The earnings of petitioner had supported them both, and Mrs. Probber was familiar with the activities that gave rise to those earnings. Considering these facts and circumstances and the absence of evidence to the contrary, there is no basis for finding that it would be inequitable to hold Mrs. Probber liable for the deficiency in income tax on their joint returns. Decision will be entered for the respondent in the amounts set forth in the Amendment to Answer.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The defense of omitted deductions often arises in cases where the Service contends that the taxpayer failed to report cash payments as income. The taxpayer may be able to prove that the cash was used to make deductible expenditures, for example, salary payments. If that can be proven, there would be a case of unreported cash income being offset by an equal unclaimed cash expenditure that is fully deductible. The net result would therefore be a "wash," with any additional income being offset by equal unclaimed deductions. [1 Fink, Tax Fraud↩ § 18.02[3], pp. 18-4 - 18-5 (1982).]
3. In their brief, without evidentiary support in the record, petitioners claim: "During the course of the I.R.S. investigation into the 1972 and 1973 tax years, affidavits from various individuals, including restaurant owners, podiatrists, etc., were provided to the I.R.S. to corroborate the fact of these expenditures." Whether or not affidavits were produced, the witnesses did not testify and thus were not made available for cross-examination in this case. Petitioners attempt to excuse their failure to corroborate certain items by referring to a Court order precluding them from introducing evidence not disclosed in their responses to discovery. At no time did petitioners tender any evidence in the category that was actually rejected by the Court.↩
4. Petitioner repeatedly refers to his acquittal by a jury as having some persuasive function. Our conclusions herein are based primarily on the lack of credibility of petitioner's testimony, and petitioner did not testify at the criminal trial. In any event, acquittal of a defendant in a criminal trial where the Government has the burden of proving the defendant's guilt beyond a reasonable doubt carries little weight in this proceeding. See Neaderland v. Commissioner,424 F.2d 639, 643 (2d Cir. 1970). In this case, it is not enough to raise a reasonable doubt. See Brooks v. Commissioner,82 T.C. 413, 433↩ (1984), appeal dismissed and reinstated (9th Cir. 1984).