T.C. Memo. 1998-337

UNITED STATES TAX COURT

ROBERT E. ILES and MONICA M. ILES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 38917-87.                    Filed September 22, 1998.

    Petitioners (Ps) were (1) trustees for several trusts
and (2) principal owners of numerous business entities, some
of which were incorporated.  The business entities provided
financial and tax planning services.  Many of the trusts
held money that people invested in the tax shelters that Ps'
businesses offered.  During the years in issue, Ps caused
many of the trusts and some of the business entities to
write checks directly to Ps or to third parties on Ps'
behalf to pay for Ps' investments and personal expenses.  By
amendment to answer, respondent asserted Ps had omitted
additional items of income.  Ps did not timely file tax
returns for 1980, 1981, or 1982.  When those returns were
finally filed, Ps did not report as income most of the
payments those entities made to Ps or to third parties on
Ps' behalf.  Petitioner husband (H) was the driving force,
with petitioner wife (W) providing computer and accounting
skills to their joint activities.  Respondent and W filed a
Stipulation of Settled Issues which conditionally disposed
of all issues concerning W's liabilities in this case.

    1.  <u>Held</u>:  Ps had substantial underpayment for 1980,
1981, and 1982.  Sec. 6653(c)(1), I.R.C. 1954.

2.  _Held_, _further_, H is liable for additions to tax for civil fraud for 1980, 1981, and 1982.  Secs. 6653(b) and 6653(b)(1), I.R.C. 1954.

3.  _Held_, _further_, H is liable for additional additions to tax for 1982 based on the portion of the deficiency attributable to fraud; amounts redetermined.  Sec. 6653(b)(2), I.R.C. 1954.

Robert E. Iles and Monica M. Iles, pro sese.

James D. Hill and Matthew J. Fritz, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, _Judge_:  Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6653(b)[1] (fraud), 6654 (failure to pay estimated tax), and 6661 (substantial understatement of income tax) against petitioner Robert E. Iles[2] as follows (amounts rounded to nearest dollar):

| | | | Additions to Tax | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b) | Sec. 6653 (b)(1) | Sec. 6653 (b)(2) | Sec. 6654 | Sec. 6661 |
| 1980 | $103,197 | $54,369 | – | – | $6,221 | – |
| 1981 | 253,014 | 126,507 | – | – | 19,387 | – |
| 1982 | 605,062 | – | $302,531 | 1 | 58,908 | $151,266 |

[1]  50 percent of the interest due on the entire deficiency.

---

[1]     The substance of sec. 6653(b) as in effect for 1980 and 1981, and sec. 6653(b)(1) as in effect for 1982, appears in secs. 6651(f) and 6663 of present law.

Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]     On Sept. 15, 1987, respondent issued a joint notice of deficiency to petitioners for 1980, and, in the absence of previously filed tax returns for 1981 and 1982, separate notices of deficiency to each petitioner for 1981 and 1982.

By amendment to answer, respondent asserts in the alternative that, if petitioner Robert E. Iles is not liable for part or all of the additions to tax for fraud for any of the years in issue, then he is liable for additions to tax under sections 6653(a) (negligence) and 6651(a) (failure to timely file tax returns) for those years.

On April 14, 1988, after respondent issued the notices of deficiency and a joint petition was filed as to all 3 years, petitioners Robert E. Iles, hereinafter sometimes referred to as Robert, and Monica M. Iles, hereinafter sometimes referred to as Monica, filed joint tax returns for 1981 and 1982. See Phillips v. Commissioner, 86 T.C. 433 (1986), affd. on this issue and revd. on another issue 851 F.2d 1492, 1496-1498 (D.C. Cir. 1988), discussing the effect of filing joint tax returns under such circumstances. In the above-noted amendment to answer, respondent recomputed the deficiencies for 1981 and 1982 by combining the adjustments to income determined in the separate notices of deficiency and using joint filing rates. Respondent's recomputation also reflects respondent's position regarding income reported and deductions claimed on petitioners' late-filed tax returns, makes certain concessions, and increases some income items. See sec. 6214(a). The results of respondent's recomputation are as follows:

|      |            | Additions to Tax | | | | |
|------|------------|-----------|-----------------|-----------------|-----------|-----------|
|      |            |           | Sec. 6653 | Sec. 6653 | | |
| Year | Deficiency | Sec. 6653(b) | (b)(1) | (b)(2) | Sec.6654 | Sec. 6661 |
| 1981 | $273,262   | $139,382  | –       | –       | $21,047  | –         |
| 1982 | 1,013,989  | –         | $508,509 | [1]    | 98,720   | $253,497  |

[1] 50 percent of the interest due on the entire deficiency.

Respondent and Monica have filed a Stipulation of Settled Issues which conditionally disposed of all issues concerning Monica's liabilities in this case.[3] This case was dismissed for lack of prosecution as it relates to the issues on which Robert has the burden of proof, except that respondent's concessions and our determinations which conflict with the notice of deficiency are also to be given effect. After respondent's concessions and the events described above, the overarching issue for decision is whether Robert is liable for civil fraud additions to tax under section 6653(b) (for 1980 and 1981), and under sections 6653(b)(1) and 6653(b)(2) (for 1982) and, as to section 6653(b)(2), in what amount. Because of our determinations as to fraud, we need not, and we do not, deal with respondent's alternative assertions as to additions to tax under sections 6651(a) and 6653(a).

---

[3] The settlement is conditional in that respondent and Monica agree that, if Robert's deficiencies or additions to tax for the years in issue are redetermined, either by settlement or trial, to be less than Monica's as set forth in the Stipulation of Settled Issues, then Monica is entitled to the lesser amounts of deficiencies or additions to tax. Although Monica and respondent do not have an ongoing dispute in the instant case, Monica technically remains a party petitioner. DeLucia v. Commissioner, 87 T.C. 804 (1986).

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners, then husband and wife, resided in Edgewater, Florida. By the time of the trial in the instant case, petitioners were divorced.

A.  Robert's Background

Robert was born in 1939 and was reared in the Cincinnati, Ohio, area. After being graduated from high school in Covington, Kentucky, in 1956, Robert served 5 years in the United States Army. He attained the rank of staff sergeant and became an honors student in the Army's Noncommissioned Officer School. During his service in the Army, Robert attended Officer Candidate School. Before leaving the Army in 1961, Robert started school at Santa Rosa Junior college. Robert continued his studies at that school until 1964, concentrating on courses in marketing. At a later date, while he was in prison (see infra T. Indictments; Criminal Convictions), Robert took accounting, psychology, and biology classes at Eastern Kentucky University.

In 1964, Robert joined Bookkeeper's Business Service Co., hereinafter sometimes referred to as BBS, as a salesman. BBS provided bookkeeping and tax services to various small- and medium-sized businesses. Between 1964 and 1969, Robert was

promoted to sales manager, interim branch manager (Cincinnati area), district sales manager (Cincinnati/Dayton area), and national new business manager, operating from the home office, in California. In February 1970, Robert returned to Cincinnati, where he began to work on insurance claims in the accounting department at General Electric. In March 1970, Profit Management, Inc., hereinafter sometimes referred to as PMI, acquired BBS. PMI operated the same type of business as BBS. Sometime during 1970, Robert began to work at PMI. In September 1970, Robert became national new business manager for PMI's sister corporation, Profit Controls, Inc., doing the same sort of work as he had done for BBS.

Monica was born in 1952. About 1972 Monica left college, without receiving a degree, and went to work for Profit Controls, Inc. Petitioners met each other at work, and, in October 1973, they got married. Petitioners had two children from this marriage--Adria, born in 1974, and Margo, born in 1976. Robert had two children from a previous marriage--Robert, Jr., born in 1959, and Billie Marie, born about 1961.

B. Associates; Consultants

In January 1973, Robert started R. Iles and Associates, (hereinafter sometimes referred as Associates), a sole proprietorship. Associates operated a bookkeeping and tax return preparation service. Robert offered franchises in Associates.

At the high point of the business, Associates had 20 franchises in the Greater Cincinnati area, 1 in Michigan and 1 in Florida. Most of Associates' franchisees' clients were small- and medium-sized businesses. Associates provided services, including the following, to its franchisees' clients: (1) Tax and business consulting; (2) tax return preparation; (3) monthly and annual financial statements; (4) cash-flow and inventory analyses; (5) source and application of funds reports; (6) expense, purchase, and payroll ledgers; (7) Forms W-2 and 1099 preparation; and (8) audit work. Associates represented to its clients that it had "the most knowledgeable consultants and advanced technology available in the accounting field." The cover of Associates' 1979 advertising brochure invited clients to "Maximize [their] profits by Minimizing [their] taxes." In time, other entities took over some of Associates' activities. However, Associates continued as a sole proprietorship for one facet of business or another until the early 1980's. Associates maintained a bank account at the Central Trust Co. until at least December 1980.

About 1979, R. Iles Tax Consultant, Inc., hereinafter sometimes referred to as Consultants, took over the bookkeeping and tax return preparation services previously performed by Associates. Robert was president and Thomas Ney, (hereinafter sometimes referred to as Ney), an accountant, was vice president

of Consultants. Robert owned 75 percent of the stock of Consultants and Ney owned 25 percent.[4]

During 1977, 1978, and 1979, Robert worked full time at his various duties at Consultants, including soliciting new clients, servicing existing clients by evaluating their business performance, reviewing clients' financial and tax records, and preparing draft tax returns. At the height of its business, Consultants had about 100 clients.

C. SSI and Its Chartered Representatives

In 1980, Robert founded and became president of Structured Shelters of Cincinnati, Inc., hereinafter sometimes referred to as SSC, which took over the functions of Consultants.[5] Initially, SSC served as a prototype for Structured Shelters,

---

[4] The parties have stipulated that Consultants "was comprised of" Robert, Monica, and Ney. However, Monica did not own any of Consultants' stock, and she was not a compensated officer for Consultants' fiscal years ending May 31 of 1979, 1980, and 1981. Consultants' corporate tax return for its fiscal year ending May 31, 1979, declares that Consultants was not incorporated until June 1, 1979, even though it had business income and business expenses reportable by it for the fiscal year before it was incorporated.

[5] So stipulated. However, stipulated exhibits show that SSC was incorporated in late June or early July 1981. One of those exhibits shows that SSC was operated as a partnership from June 1, 1981, to Aug. 1, 1981. The parties also have stipulated that "Structured Shelters of Cincinnati was formed in the late 1970's by Robert and Monica Iles and others." It may be that Structured Shelters of Cincinnati was a partnership which was somehow a predecessor of SSC, the corporation, even though the chronology does not seem to fit. As shown infra in table 1, Robert was a prolific creator of business entities. SSC figures more importantly infra items M. and N.

Inc., hereinafter sometimes referred to as SSI, which was incorporated on or about August 28, 1980. SSI was a subchapter S corporation. During 1981 and 1982, Robert was chairman of SSI's board of directors, Monica was secretary and treasurer, and Adrian Doyle (hereinafter sometimes referred to as Doyle) was president. Doyle was in charge of SSI's marketing operations. During 1981 and 1982, Robert owned 52 percent of SSI's common stock, and Monica and Doyle each owned 24 percent.

Robert had SSI incorporated under Ohio law to market "a nationwide tax planning system." SSI's principal business was tax shelter investigation and management. During the years in issue, SSI marketed various tax shelters throughout the United States through a network of "Chartered Representatives". At the height of its business operations, SSI had 115 Chartered Representatives in 33 States and had about 7,000 clients, about half of whom invested in tax shelters. After SSI was founded, SSC became a Chartered Representative for SSI, to market SSI's products in the Cincinnati area.

Robert oversaw SSI from both financial and business standpoints. He worked extensively with SSI's Chartered Representatives. Robert also conducted or participated in client seminars outside of Ohio where he discussed SSI's organization, functions, and products.

Chartered Representatives were people or entities that had the right to represent SSI in specific geographic areas. To become an SSI Chartered Representative, a person or entity had to pay $14,500 for a computer and operating software, and $18,500 for the "SSI System" which included use of financial planning software. The Chartered Representative also had the option to buy the financial planning software program from SSI for a $152,000 promissory note. Under the standard agreement, each Chartered Representative was required to earn $100,000 in gross volume, net of any fees to SSI, during the first year of the agreement, and to maintain that volume of business. If a Chartered Representative did not meet that requirement, then SSI reserved the right to terminate the agreement and refund the original cash investment. Other amounts that Chartered Representatives paid to SSI included (1) "set-up" fees that Chartered Representatives charged their clients for putting those clients into the computer system, (2) "options" fees that Chartered Representatives paid in order to reserve office locations, (3) "due-diligence" fees that the Chartered Representatives' clients paid, as a percentage of a client's investment in a tax shelter, for SSI's efforts in investigating that shelter, and (4) "management" fees that were charged to the Chartered Representatives' clients for managing the tax shelters in which those clients invested. Hereinafter, the term Chartered

Representative Fees refers to all of the money SSI collected from Chartered Representatives.

SSI represented to its Chartered Representatives that each investment it promoted was carefully selected for its investment potential and tax-sheltering features; forbade its Chartered Representatives to offer to their clients any investment opportunities other than those offered by SSI; and agreed "to defend any suit in any federal tax court based upon an attempt by the Internal Revenue Service to deny the tax deferring features resulting from SSI's investments." SSI promoted its services as a means of sheltering clients' incomes from "unnecessary taxes", and described its products as tax shelters. Each individual client of SSI (1) created an investment company as a sole proprietorship that executed a Declaration of Trust naming SSI as Trustee and (2) executed a Management Agreement naming SSI as manager of its investment company. The purpose of the Declaration of Trust was to allow SSI to acquire tax shelters for the client, and the Management Agreement obligated the client to pay SSI 1 percent of the client's gross income on a quarterly basis and 10 percent of the proceeds from all SSI-recommended investments.

Under the Management Agreement, each client was to receive a "Random Report"--a periodic statement of the client's financial position. Random Processing Services, Inc., a subchapter C

corporation formed and owned by Robert, prepared the Random Reports.[6] Robert designed the output portion of the Random Processing System that analyzed SSI's client's financial information and produced the Random Reports. The fee for the first Random Report was $155; each quarterly Random Report thereafter cost $20.

Robert directed SSI's board of directors meetings and some of the shareholder meetings. Robert (1) worked directly with third parties who presented tax shelter proposals to SSI and (2) performed due diligence work in connection with the tax shelter offerings. Robert worked with attorneys to determine how SSI's tax shelter programs would be put together and offered. Robert had veto power over which tax shelters would be offered to SSI's clients.

Periodically, Robert asked Monica, SSI's treasurer, about SSI's financial performance. By letter dated March 8, 1982, Monica informed Robert and Doyle that SSI's 1981 gross receipts and net receipts on a cash basis were $2,384,052 and $893,312,

---

[6] So stipulated. In Cunningham v. Commissioner, T.C. Memo. 1989-260, which involved tax liabilities of clients of some of Robert's and Monica's entities, we found, based on the record made by the parties in that case, that Random Processing Services, Inc., was a corporation formed by Monica. Also see the extensive discussion of SSI's operations in Rybak v. Commissioner, 91 T.C. 524 (1988).

respectively.[7]  By memorandum dated September 13, 1982, SSI's

controller, Tom Basti, hereinafter sometimes referred to as

Basti, listed petitioners' income from SSI for 1981 and for the

first 6 months of 1982 as $206,336.60 and $437,592.15,

respectively.

SSI's principal bank account was in Central Trust Co.; it

was used primarily as a depository for Chartered Representative

Fees and SSI client funds.  SSI also had accounts in other banks.

In 1981, 37 checks and 1 wire transfer, totaling $129,285.67,

were drawn on SSI's Southern Ohio Bank account to petitioners or

to third parties on petitioners' behalf; the entire amount was

1981 income to petitioners.[8]

---

[7]  Monica's memorandum states that the report was prepared on a cash basis.  This one-page memorandum was introduced through Monica on direct examination by respondent.  Later the same day, on cross-examination by Robert, Monica testified that SSI used an accrual method of accounting; we have so found.  The parties have stipulated, and we have found, infra, that SSI prepared and maintained substantially all of its books and records contemporaneously.  We have not found in the record an explanation of why Monica would have produced a cash basis report while contemporaneously maintaining, or overseeing the maintenance of, accrual basis records.

[8]  The parties' stipulation lists 40 checks and 1 wire transfer.  Respondent's proposed finding omits three of the checks.  We treat this as respondent's implicit concession of the $8,797.39 total of these three checks.

Respondent's proposed finding lists each of the remaining 37 checks and 1 wire transfer, but incorrectly shows the total amount as $120,285.67.  The parties stipulated to the amount of each check and wire transfer.  The $9,000 error in the total probably stems from a transposition of two digits during the

(continued...)

On October 30, 1981, two checks totaling $23,000, were drawn on SSI's Gradison Cash Reserves Account to third parties on petitioners' behalf as performance bonuses for Robert. The $23,000 was 1981 income to petitioners.

In 1982, 36 checks, totaling $198,850, were drawn on SSI's Southern Ohio Bank account to petitioners or to third parties on petitioners' behalf; the entire amount was 1982 income to petitioners.[9]

In addition, in 1982, six checks, totaling $170,500, were drawn on SSI's Southern Ohio Bank account to Structured Shelters Securities, Inc., hereinafter sometimes referred to as SSSI; they constituted capital contributions to SSSI on behalf of Robert (52 percent), Monica (24 percent), and Doyle (24 percent). Also in 1982, four checks, totaling $59,237.27, were drawn on that account to Finkelstein, Thompson, and Levenson, a Washington, D.C., law firm; they, too, constituted capital contributions to SSSI on behalf of Robert, Monica, and Doyle in the same

---

[8](...continued)
process of adding the stipulated amounts. We do not have any reason to believe that petitioners were misled or in any way prejudiced by respondent's arithmetic error on brief. As a result, we do not treat respondent's proposed finding on this point as an implicit concession of $9,000.

[9] The parties' stipulation lists 42 checks and 1 wire transfer. Respondent's proposed finding omits six of the checks and the one wire transfer. We treat this as respondent's implicit concession of the $23,108.30 total of these six checks and the wire transfer.

proportions. SSSI is discussed further infra at item Q. Also in 1982, a check in the amount of $18,716 was drawn on that account to one Howard Blumenthal; it, too, constituted a capital contribution to SSSI on behalf of Robert, Monica, and Doyle in the same proportions.

In addition, in 1982, two checks, totaling $14,000, were drawn on SSI's Southern Ohio Bank account to Structured Shelters Financial Management, Inc., hereinafter sometimes referred to as SSFMI; they, too, constituted capital contributions to SSFMI on behalf of Robert (52 percent), Monica (24 percent), and Doyle (24 percent). SSFMI is discussed further infra at item R.

As a result, petitioners had 1982 income in the amount of $199,464.49 on account of SSI's 1982 payments of capital contributions to SSSI and SSFMI on petitioners' behalf.

1. SSI's Financial Books and Records

SSI used an accrual method of accounting and had a fiscal year ending July 31. SSI prepared and maintained a contemporaneous balance sheet, a general ledger, a check disbursement schedule, a journal, and profit and loss statements during its fiscal years 1981 and 1982. SSI prepared and maintained a contemporaneous cash receipts journal for the period September 19, 1980, through July 31, 1982. SSI prepared and maintained contemporaneous profit and loss statements and journal entries related to bank statement debits during its fiscal year

1982.  SSI kept its books and records at SSI's headquarters, where Robert had an office and worked on a daily basis.  SSI maintained a comprehensive tax library.

2.  SSI's 1981 Undistributed Taxable Income

For its fiscal year ended July 31, 1981, SSI received, and deposited into the Structured Shelters bank account, $436,400 in gross income, consisting of $374,000 from Chartered Representative Fees, $8,900 from setup fees, and $53,500 from options.  SSI's deductible expenses for this fiscal year total $252,663.06.  As a result, SSI's taxable income for this fiscal year is $183,736.94.  In addition, during this fiscal year SSI made $75,498.55 in payments to or for the benefit of its shareholders--$30,069.75 as to petitioners and $45,428.80 as to Doyle.  As a result, SSI's undistributed taxable income for its 1981 fiscal year is $108,238.39.  Petitioners' 76-percent share (Robert--52 percent, Monica--24 percent) of this amount is $82,261.18.

SSI's fiscal 1981 tax return is discussed infra S. Tax Returns.

3.  SSI's 1982 Undistributed Taxable Income

For its fiscal year ended July 31, 1982, SSI had gross income of $6,371,589.  SSI's deductible expenses for this fiscal year, plus SSI payments to or for the benefit of its shareholders, total $4,958,269.90.  As a result, SSI's

undistributed taxable income for its 1982 fiscal year is $1,413,319.10. Petitioners' 76-percent share (Robert--52 percent, Monica--24 percent) of this amount is $1,074,122.52.

D. Free Enterprise Trust

SSI marketed some tax shelters under the name "Free Enterprise Trust", hereinafter sometimes referred to as the FE Trust. Petitioners, as trustees, maintained the FE Trust's Southern Ohio Bank account, which was used predominantly by SSI clients as a depository for investments. Amounts disbursed from the account were used mainly to buy tax shelter investments for SSI's clients. During the period December 1, 1981, through February 24, 1982, a total of $8,827,197.09 was deposited into the FE Trust's Southern Ohio Bank account, and $8,564,090.55 was disbursed from this account. The FE Trust did not file a tax return.

A $176,500 withdrawal from this account is discussed infra under I. Lincoln American Securities.

E. Riago Trust

In 1980, Robert suggested to Monica that petitioners transfer all of their assets to a trust. On May 4, 1981, petitioners, as grantors, executed a Declaration of Trust establishing Riago Revocable Trust, hereinafter sometimes referred to as the Riago Trust. Robert was the principal author of the Declaration of Trust establishing the Riago Trust. The

Declaration of Trust states that the Riago Trust was created for the benefit of petitioners and their daughters, Adria and Margo. (The word "Riago" is coined from the last letters of petitioners' daughters' names.) Petitioners were the trustees of the Riago Trust. The Riago Trust was revocable by the grantors jointly, or by the surviving grantor. Petitioners, as grantors, had the power, at any time, to withdraw any portion of the net income or principal of the trust.

Petitioners conveyed all of their real, personal, and business property to the Riago Trust, including the following: Their residence; life insurance death benefits; jewelry; household furnishings; stock or proprietary interests in Associates (also discussed supra item B), Green, Inc., Random Processing Services, Inc., Consultants (also discussed supra item B), Robert Iles Computer Services, Inc., SSI (also discussed supra item C), and SSC (also discussed supra item C); and "Any and all other business endeavors." Before and after they conveyed their property to the Riago Trust, petitioners lived in the same house in Cincinnati. By letter dated August 18, 1982, Monica, as cotrustee, informed Robert, as cotrustee, that the Riago Trust's assets include a 1980 Rolls Royce, new residential rental property, office furniture and equipment, a 76-percent interest in the Rise Trust, a Saberliner Jet, jewelry, improvements on their home, and miscellaneous household

furnishings and fixtures, and asked that the letter be added to schedule A of the Declaration of Trust.  The jewelry Robert bought and transferred to the Riago Trust during 1982, included a $3,780 gold bracelet, $1,600 gold and diamond earrings, a $7,050 diamond ring, and a $7,950 Rolex watch.

On October 20, 1983, about 1-2 months after petitioners and their daughters moved from Ohio to Florida, the Declaration of Trust for the Riago Trust was filed in Florida.  On December 19, 1983, petitioners amended the Riago Trust's Declaration of Trust. Among other changes, the amendment purported to make the Riago Trust irrevocable.  A commentary and attachment to the Riago Trust's financial statement, signed by Robert on October 23, 1984, lists the trust assets as having a total value of $10,194,060.08, liabilities of $367,336.49, and a net value of $9,826,723.59.  The listed assets include the following: A 1981 Rolls Royce, a 1979 Cadillac Eldorado, a 1954 Corvette, a 1984 Chrysler LeBaron, a Russian Sable coat and jewelry valued at $67,000, a $270,000 home, a $110,000 home, a $300,000 home, a $361,000 interest in a Saberliner Jet, and a $25,000 interest in Lincoln American Securities, Inc.  Robert bought the Corvette, Cadillac, and sable coat.  Monica wore the sable coat.

On August 20, 1983, Robert, as trustee for the Riago Trust, bought two homes in Edgewater, Florida.  Petitioners and their daughters lived in one of the homes.  On February 13, 1984,

petitioners, as trustees for the Riago Trust, bought another home in Edgewater; then they moved their family into that home. At about this time, petitioners, as trustees for the Riago Trust, sold the first two homes. A plaque on the front door of the home bought in 1984 stated that the property was owned by the Riago Trust.

A general ledger was maintained for Associates. When Associates, as Robert's sole proprietorship, paid a personal expense of petitioners, then that was recorded as a draw on Associates' general ledger. On and after May 4, 1981, when the Riago Trust owned Associates, such payments were shown on Associates' general ledger and also on the Riago Trust's books as payments by the Riago Trust, through Associates, for petitioners' personal purposes.

During 1981 and 1982, Associates paid for a variety of petitioners' expenses including jewelry, suntanning equipment, scuba gear, private school tuition, record and tape clubs, a lawn tractor, mortgage payments, home remodeling bills, utility bills, real estate taxes, homeowner's insurance, clothing and household bills, dry cleaning, groceries, toys, pet supplies, furniture, donations, and medical bills. After petitioners moved to Florida, a separate bank account was established for the Riago Trust. From 1984 through 1987, the Riago Trust continued to pay for petitioners' personal items and expenses.

F.   The Florida Collection Suit

Glenn Storch, hereinafter sometimes referred to as Storch, is a Florida attorney who represented David Ellsworth and James Morrison in a judgment collection suit, hereinafter sometimes referred to as the Florida collection suit, filed in 1984, against Robert, the Riago Trust, and various entities controlled by Robert.  Before that suit, David Ellsworth and James Morrison had obtained an out-of-State judgment against Robert.  Storch obtained a domestication of foreign judgment against Robert to pursue the out-of-State judgment.

After filing the Florida collection suit, Storch began formal discovery against Robert and the Riago Trust.  During discovery, Storch found that all of Robert's property was held by the Riago Trust.  As part of that discovery, Storch deposed Robert on several occasions, at which time Robert told Storch that it was fruitless for Storch's clients to try to collect on their judgment because neither he nor Monica owned anything, not even the clothes on their backs.  Whenever Robert or Monica attended depositions, they arrived in a Rolls Royce.   At Storch's meetings with petitioners, petitioners wore jewelry, including a Rolex watch and a diamond ring.  During the course of discovery, Storch saw a 1954 Corvette, extensive exercise equipment, and a Jacuzzi at petitioners' home.  Robert told Storch that petitioners did not pay any rent to the Riago Trust,

even though it owned their home; Robert explained that this was because their daughters lived there and their daughters were the Riago Trust's beneficiaries.

In 1989, Storch obtained a Florida judgment which permitted his clients to collect their prior judgment from assets held by the Riago Trust. Storch was able to seize only clothing, exercise equipment, and "some odds and ends" from petitioners' home; he was unable to locate some assets, and some assets were so heavily liened that Storch did not believe there was enough unencumbered equity to make it worthwhile to pursue them.

G. Cocoa Trusts

During 1980 and 1981, Robert acted as a trustee for Cocoa Trust I, II, III, IV, V, and VI, hereinafter sometimes collectively referred to as the Cocoa Trusts. The Cocoa Trusts were established in 1980, as vehicles for various individuals' investments in certain patents and to help fund Continental Dutch Cocoa, Inc. The Cocoa Trusts Escrow Fund, an account in Southern Ohio Bank, served as a depository account for the Cocoa Trusts' investors' funds and as the general operating fund for the project that included Continental Dutch Cocoa, Inc., and the patents. SSI solicited investors for the Cocoa Trusts, and served as the manager of the Cocoa Trusts' project.

In 1980, Monica wrote four checks totaling $100,000 to Robert from the Cocoa Trust Escrow Fund.[10]  One of these checks, for $90,000, is discussed infra at item H.  All $100,000 was 1980 income to Robert.

In 1981, seven checks totaling $29,300 were written to Robert from the Cocoa Trusts Escrow Fund.[11]  All $29,300 was 1981 income to Robert.

H.  Robert Iles, et al.

In 1978, Robert and Robert C. McCormick, hereinafter sometimes referred to as McCormick, formed the partnership Robert Iles, et al.  Robert Iles, et al., was a "computer company", providing data processing and other services.  Robert had a 65-percent interest in Robert Iles, et al., and was the partnership's managing partner.  McCormick had a 35-percent interest in Robert Iles, et al.  Both partners contributed capital and both partners were authorized signatories on the partnership's loan account at Central Trust.  Robert and Monica

---

[10]    In the notice of deficiency as to 1980, respondent had determined that eight specified checks drawn on the Cocoa Trusts Escrow Fund, in amounts totaling $143,260, constituted unreported 1980 income from the Cocoa Trusts to petitioners.  Respondent has conceded four of these checks, totaling $43,260.  Our findings relate only to the remaining four checks totaling $100,000.

[11]    In the notice of deficiency, respondent determined that eight checks, totaling $31,300, were 1981 income to Robert.  By stipulation, respondent conceded the eighth check, a $2,000 check to Maximum Management, an entity described infra at L.

were the only authorized signatories on the partnership's checking account at Central Trust.

On December 1, 1978, Robert Iles, et al., acquired the assets and business of Computing and Accounting Group, Inc., hereinafter sometimes referred to as CAGI.[12]  Before this transfer, CAGI offered computer services, computer programming and design, computer installation, and other related computer services.

In February 1979, Robert Iles, et al., bought a computer, peripherals, and software from Monitor Information Systems for $166,500.  This purchase was financed in part by a loan from Central Trust.  Under the financing agreement, Central Trust acquired a security interest in the computer and in all the fixtures and equipment located at petitioners' personal residence and their business offices, in Cincinnati.  Petitioners, McCormick, and McCormick's wife were personally liable on the loan.  McCormick stopped being associated with Robert Iles, et al., in 1980 or later.

---

[12]    The stipulated Dec. 1, 1978, agreement between Robert Iles, et al., and CAGI states that the only two partners in Robert Iles, et al., are Robert and Peter J. Reil.  Yet, both the stipulated partnership agreement of Nov. 18, 1978, and the stipulated partnership 1979 income tax return show Robert and McCormick as the only two partners in Robert Iles, et al.  It appears that Reil and Robert were supposed to create this partnership.  Reil decided not to participate.  McCormick learned of this development and stepped in.

Certain loan payments with respect to the computer were not made, and Central Trust threatened foreclosure on the computer. On December 5, 1980, a $90,000 check payable to Robert was drawn on the Cocoa Trusts Escrow Fund. See supra item G. Cocoa Trusts. On December 9, 1980, a $92,000 deposit was made to Associates' bank account in Central Trust. Immediately before this deposit, this bank account had a balance of $569.52. Monica thereupon drew a check on Associates' Central Trust account, dated December 9, 1980, in the amount of $89,215.22, to Central Trust, to pay in full the remaining balance on the Robert Iles, et al., loan that had been taken out to finance the computer, etc., purchase. Petitioners' primary motive to repay the loan was to remove the security interest Central Trust had in assets in their personal residence and business office. The $89,215.22 check cleared Associates' Central Trust account on December 10, 1980. After a $74.10 charge to the account, this left a balance of $3,280.20. After that payment, Central Trust's security interest terminated.

The $90,000 Cocoa Trusts Escrow Fund withdrawal was used by petitioners to pay the debt from the computer, etc., purchase.

I. Lincoln American Securities

In 1981, Robert began to search for a broker-dealership he could buy in order to facilitate sales of investment products and in order to comply with applicable securities laws. Robert also wanted an entity which could act as surety on his appeal bonds in

a breach-of-contract suit that he had lost at the trial level. In order to carry out these plans, on August 7, 1981, Robert, bought all the stock of Lincoln American Securities, Inc. (hereinafter sometimes referred to as Lincoln Securities), for $65,000, with $25,000 due at the closing and the balance, with interest, payable in three equal annual installments, which Robert personally guaranteed.[13] A check drawn on SSI's Gradison Cash Reserves account paid the $25,000 that was due at the closing. The notation "R. Iles personal draw" was on the check.

On August 10, 1981, Robert and Lincoln Securities executed three stay-of-execution bonds for the appeal in the above-noted litigation. The bonds totaled $176,500. Lincoln Securities was surety on all three bonds. After the execution of the three appeal bonds, it was discovered that Lincoln Securities did not have enough capital to act as surety on the bonds. On December 17, 1981, $176,500 was withdrawn from the FE Trust's Southern Ohio Bank account and shortly thereafter was placed in an interest-bearing escrow account in Robert's name in the same bank to fund Robert's appeal bonds. See supra D. Free Enterprise Trust. In a net worth statement that petitioners submitted in connection with a 1983 loan application, petitioners listed the

---

[13] The preamble of the Agreement of Acquisition shows the buyer as "Lincoln American Holding Company" but it is clear from the rest of that document and from other documents that both Robert and Lincoln Securities' seller considered Robert to be the buyer. See infra table 1.

escrow account (which by then had grown to $181,280) as their own asset. On the application, this was offset by a $176,000 [$176,500?] "contingent liability". There is no indication that petitioners understood they had any obligation to return the money to the FE Trust.

The $176,500 withdrawn from the FE Trust's Southern Ohio Bank account on December 17, 1981, was 1981 income to petitioners.

J.  Random Processing Services

Random Processing Services' bank account was the principal bank account for Random Processing Services, Inc., and served as a depository account for the Random Report fees paid by SSI clients.[14]  In 1980, five checks totaling $8,675 were drawn on Random Processing Services' bank account to petitioners. All $8,675 was 1980 income to petitioners. On March 17, 1981, a $1,000 check was drawn on this account to Monica. This $1,000 was 1981 income to petitioners. In 1982, two checks totaling $15,000 were drawn on this account to Monica. All $15,000 was 1982 income to petitioners.

K.  Monica Iles Shelters Trustee Account

The Monica Iles Shelters Trustee account served as a depository account for investors in various tax shelters promoted

---

[14]    This bank account is different from the SSI bank account described supra, which was used primarily as a depository for Chartered Representative Fees and SSI client funds; the two accounts are in the same bank.

or managed by SSI.  In 1980, 38 checks totaling $45,631.78, drawn on the Monica Iles Shelters Trustee account, were written to petitioners or to third parties on petitioners' behalf.[15]  All $45,631.78 was 1980 income to petitioners.  In 1981, 29 checks totaling $42,961.11, were drawn on the Monica Iles Shelters Trustee account to petitioners or to third parties on petitioners' behalf.[16]  All $42,961.11 was 1981 income to petitioners.

L.  Maximum Management

Petitioners formed Maximum Management, as Monica's sole proprietorship, to pay payroll and other expenses of SSI and other entities petitioners controlled.  Maximum Management received the funds to pay these expenses through intercompany billings to various entities controlled by petitioners.  During 1981, Maximum Management wrote 1 $300 check to Monica[17] and 44 checks totaling $5,225.92[18] to Jacqueline B. Watkins, hereinafter

_____

[15]  One of these checks, number 214, is in the amount of $1,500.  The check stub shows $609.11 of this amount as "Cash". Respondent included only this $609.11 in the notice of deficiency determination.

[16]  One of these checks, number 245, is in the amount of $450.  In the ledger for this account, $154 of this amount is distributed to "Iles draw".  Respondent included only this $154 in the notice of deficiency determination.

[17]  Respondent's proposed finding of fact asks that we find that the check to Monica was for $500.  However, the only source that respondent cites for this proposition shows that the entire check was for $300.

[18]  Respondent's proposed finding of fact departs in
(continued...)

sometimes referred to as Watkins.[19]  During 1982, Maximum Management wrote 47 checks totaling $6,049.81 to Watkins.[20] These 1981 and 1982 payments by Maximum Management to Watkins were for Watkins' services in taking care of petitioners' children.

All $5,525.92 ($300 to Monica, plus $5,225.92 to Watkins) was 1981 net profit of Maximum Management, and so was 1981 income to petitioners.  All $6,049.81 was 1982 net profit of Maximum Management, and so was 1982 income to petitioners.

---

[18](...continued) amounts as to 8 of these 44 checks from the only source that respondent cites.  Our finding is in accordance with the sum of the amounts in the cited exhibit, which is $125.37 less than the sum of the amounts in respondent's proposed finding of fact.

[19]    The cited source for respondent's proposed finding of fact shows that five other checks, totaling $562.51, were written by Maximum Management to Watkins between Jan. 16, 1981, and Feb. 13, 1981.  Respondent has not included these checks in the proposed finding of fact; we treat this as respondent's concession that these five payments by Maximum Management to Watkins did not result in income to petitioners.

[20]    Respondent's proposed findings of fact list three additional checks to Watkins, totaling $352.97, and ask us to find that those checks also gave rise to income to petitioners. The first of these checks does not appear in the exhibit that respondent cites as the sole source for the proposed finding. The second of these checks does appear in the cited exhibit, but was voided; indeed the next check, which respondent also includes in the proposed finding of fact, shows that it was written to replace the voided check.  The third of these checks, is shown in respondent's proposed finding of fact as being made out to Watkins in the amount of $119.83; in the cited exhibit it is made out to Central Trust Co. in the amount of $3,874.05.  We conclude that none of these three checks is income to petitioners.

M.  First Sale of Interest in Structured Shelters of Cincinnati

As noted supra, SSC became a Chartered Representative for
SSI, to market SSI's products in the Cincinnati area.  SSC's
principal business activity was financial planning.  In March
1981, when Robert entered into an agreement to sell an interest
in SSC to Gary Elliot, hereinafter sometimes referred to as
Elliot, SSC was wholly owned by Robert.

By letter dated September 25, 1981, Robert told Elliot that
the purchase price of a 50-percent interest in SSC was $250,000,
which included a $50,000 down payment.  As of that date, Elliot
had paid $10,000 of the down payment.  Later, the sale was
rescinded.  On Schedule D of their 1981 tax return, petitioners
reported $10,953 as a long-term gain from the attempted sale of
Structured Shelters of Cincinnati, Inc.

Petitioners are taxable on this $10,953 as a 1981 long-term
capital gain.[21]

N.  Second Sale of Interest in Structured Shelters of Cincinnati

On March 22, 1982, Robert entered into an agreement to sell
SSC to Kent Maerki, hereinafter sometimes referred to as Maerki,

---

[21]    As noted supra, petitioners filed their 1981 and 1982
joint tax returns after respondent issued the notices of
deficiency for these years.  In the notice of deficiency to
Robert, respondent determined that Robert had $10,000 ordinary
income from this transaction.  By their 1981 joint tax return,
petitioners have conceded that the correct amount is $10,953,
$953 greater than the amount respondent determined.  Respondent
has conceded, on brief, that petitioners are entitled to treat
the income as long-term capital gain.

and SSI consented to Robert's transfer of SSC to Maerki. On that same day, a certificate for 255 shares of SSC stock was issued to Christina M. Gambetta (Maerki's sister), and a certificate for 245 shares of SSC stock was issued to John A. Gambetta (Maerki's brother-in-law). Maerki was to pay Robert $150,000, in three equal installments on May 1, August 1, and November 1, 1982.

On or about April 29, 1982, Maerki lent $55,000 to SSC, of which (1) SSC paid $50,000 to SSI as the May 1, 1982, required installment, and (2) SSC paid $1,923.29 to SSI as the required interest, under the Maerki-Robert sales agreement. On September 1, 1982, SSC paid $10,000 to Robert. On Schedule D of their 1982 tax return, petitioners reported $61,923 as a long-term capital gain from partnerships and fiduciaries, related to Robert's sale of SSC.

Petitioners received $60,000 long-term capital gain income and $1,923.29 interest income for 1982 on account of Robert's sale of SSC.

O. Rolls Royce

On February 12, 1982, Robert, as trustee for the Riago Trust, bought a Rolls Royce car for $79,000. SSI paid the $10,000 deposit on the car on February 10, 1982, and the $69,000 balance on the car on February 16, 1982. SSI also paid the $4,345 Ohio sales tax on the car on March 12, 1982. SSI's general ledger listed the $79,000 in wire transfers and the

$4,345 in sales tax that SSI paid on the Rolls Royce as performance bonuses to Robert.

On February 16, 1983, title to the Rolls Royce was transferred as a gift from Robert, as trustee for the Riago Trust, to Robert individually.

Petitioners listed the Rolls Royce, valued at $90,000, as a personal asset in the net worth statement that they submitted in connection with a 1983 loan application. After the $30,000 loan was approved, the bank took a security interest in the Rolls Royce.

The $83,345 that SSI paid in 1982 to buy the Rolls Royce ($10,000 plus $69,000 plus $4,345) was 1982 income to petitioners.

P. Saberliner Jet Aircraft

On February 5, 1982, Robert, acting individually and on behalf of the Rise Trust, entered into an agreement to buy a Saberliner Jet Aircraft, hereinafter sometimes referred to as the Jet,[22] for $1,205,000. This total was to be paid as follows: $25,000 as a deposit that day, $375,000 at delivery, and a 1-year

---

[22] There was not any declaration of trust or other formal document establishing the Rise Trust. There were not any Rise Trust bank accounts. The record does not indicate any "activity" of Rise Trust other than being the named purchaser of the Jet. As far as we can tell from the fragments of information in the record, the Rise Trust is merely a name used by petitioners and Doyle as a "straw man" in connection with their intended coownership of the Jet, with Robert having a 52-percent interest, Monica having a 24-percent interest, and Doyle having a 24-percent interest.

note for $700,000 plus $105,000 interest--in the amount of $17,500 a month starting 6 months after delivery. Robert, acting on behalf of the Rise Trust, signed the security agreement in connection with the $700,000 note. Robert individually guaranteed the note. SSI paid the $25,000 deposit on February 5, 1982. Robert, acting on behalf of the Rise Trust, accepted delivery of the Jet on February 16, 1982. The FE Trust paid the $375,000 that was due at delivery.

Petitioners, as 76-percent owners of the Rise Trust, had 1982 income in an amount equal to 76 percent of the $400,000 of 1982 payments made by their controlled entities ($25,000 by SSI, plus $375,000 by the FE Trust) for the Jet, or $304,000.

Q. Structured Shelters Securities

In August 1982, petitioners and Doyle formed Structured Shelters Securities, Inc., hereinafter sometimes referred to as SSSI. SSSI was incorporated in Delaware. SSSI was formed on the advice of Finkelstein, Thompson, and Levenson in order to bring SSI's investment offerings into compliance with Federal securities laws and regulations. SSSI was to act as a registered broker-dealer of securities; it was to locate investments for, and to act as an investment adviser and financial planner to, SSI's clients.

As we have found (supra C. SSI and Its Chartered Representatives), in 1982 SSI paid $229,737.27 as capital contributions to SSSI ($170,500 directly to SSSI and $59,237.27

to Finkelstein, Thompson, and Levenson), and these contributions were allocated among Robert (52 percent), Monica (24 percent), and Doyle (24 percent).

Petitioners listed $263,260.11 paid-in capital for SSSI as a personal asset in the net worth statement that they submitted in connection with a 1983 loan application. Supra O. Rolls Royce. A July 31, 1983, SSSI balance sheet shows total paid-in capital of $448,665.

The capital contributions by SSI to SSSI on behalf of petitioners are 1982 income to petitioners.

R. Structured Shelters Financial Management

In August 1982, petitioners and Doyle formed Structured Shelters Financial Management, Inc., hereinafter sometimes referred to as SSFMI. SSFMI was incorporated in Delaware at the same time as SSSI. SSFMI was formed on the advice of Finkelstein, Thompson, and Levenson to act as an investment adviser to SSI's clients.

As we have found (supra C. SSI and Its Chartered Representatives), in 1982 SSI paid $14,000 as capital contributions to SSFMI, and these contributions were allocated among Robert (52 percent), Monica (24 percent), and Doyle (24 percent). Petitioners listed $43,103.69 paid-in capital for SSFMI as a personal asset in the net worth statement that they submitted in connection with a 1983 loan application. Supra O.

Rolls Royce.  The capital contributions by SSI on behalf of petitioners are 1982 income to petitioners.

S.  Tax Returns

Petitioners are cash basis taxpayers.

1.  Petitioners' 1980 Tax Return

On April 15, 1981, petitioners filed for an extension of time to file their 1980 tax return.  Respondent granted to petitioners an extension to June 15, 1981.  Additional extensions for petitioners' 1980 tax return were neither sought by petitioners, nor granted by respondent.  Petitioners filed their joint 1980 tax return on September 18, 1981.

On their 1980 tax return, petitioners reported (1) $79,989 gross income and $71,154 net profit from Associates, (2) $19,010 gross income and $39,128 net loss from Robert Iles Computer Services, and (3) a $13,860 net loss from Robert Iles, et al. Petitioners reported their total 1980 tax liability as $5,541 ($1,283 income tax, $1,471 self-employment tax, and $2,787 tax from recomputing prior-year investment credit).  Below their signatures, petitioners wrote the following:  "This return was prepared under duress due to summons and it will be amended." However, petitioners never amended their 1980 tax return.

2.  Petitioners' 1981 Tax Return

On April 15, 1982, petitioners filed for an extension of time to file their 1981 tax return.  Respondent granted to

petitioners an extension to June 15, 1982, a further extension to August 15, 1982, and a final extension to October 15, 1982. Petitioners filed their 1981 tax return on April 14, 1988, after the notices of deficiency were issued and the petition was filed.

On their 1981 tax return, petitioners reported (1) $44,107 gross income and $24,585 net profit from Associates, (2) $15,298 gross income and $16,285 net loss from Robert Iles Computer Service, (3) $68,529 gross income and net profit from Robert's role as business manager of Riago Trust, (4) $35,451 gross income and $4,770 net loss from Maximum Management, (5) $35,648 as grantor trust income from Riago Trust, and (6) $10,953 long-term capital gain from the attempted sale of SSC. Supra M. First Sale of Interest in Structured Shelters of Cincinnati. Petitioners reported their total tax liability as $5,501 ($1,304 income tax, $2,762 self-employment tax, and $1,435 alternative minimum tax).

3. Petitioners' 1982 Tax Return

On April 15, 1983, petitioners filed for an extension of time to file their 1982 tax return. Respondent granted to petitioners an extension to August 15, 1983. Petitioners did not seek, and respondent did not grant, any additional extensions for petitioners' 1982 tax return. Petitioners filed their 1982 tax return on April 14, 1988, after the notices of deficiency were issued and the petition was filed.

On their 1982 tax return, petitioners reported (1) $121,918 gross income and $106,416 net profit from Robert's role as trust manager (presumably from Riago Trust), (2) $7,899 gross income and $154 net profit from Maximum Management, (3) $178,658 as grantor trust loss from Riago Trust, (4) $61,923 long-term capital gain from the sale of SSC, and (5) a $3,589 short-term capital gain pass-through from Riago Trust.  Supra N. Second Sale of Interest in Structured Shelters of Cincinnati.  Petitioners reported their total tax liability as $3,029, all from self-employment tax.

4. Structured Shelters' and Riago Trust's 1981 and 1982 Tax Returns

On its tax return for its fiscal year ended July 31, 1981, filed on April 6, 1982, SSI reported gross income of only $8,347 and undistributed taxable income as a loss of $353,185.56.  This tax return was signed by Monica.  Petitioners did not report any pass-through income or loss from SSI on their tax return for 1981.  SSI did not file a tax return for its fiscal year ending July 31, 1982.

Fiduciary tax returns for the Riago Trust for 1981 and 1982 were filed on September 10, 1988, several months after petitioners filed their 1981 and 1982 tax returns.  The Riago Trust's tax returns for these years treated the Riago Trust as a grantor trust, with Robert as the grantor.  Petitioners' 1981 and 1982 tax returns include flow-through income and losses from the

Riago Trust. Respondent agrees that the Riago Trust was a grantor trust.

T. Indictments; Criminal Convictions

On April 9, 1987, a Federal grand jury indicted petitioners on 139 counts of criminal tax violations. Two of the counts applied only to Monica. The 137 counts against Robert only, or Robert and Monica, are as follows: (1) One count of conspiracy to defraud the United States and investors in connection with certain tax shelter sales in violation of 18 U.S.C. sec. 371 (1994); (2) 133 counts of aiding and assisting in the preparation of false tax returns in violation of 26 U.S.C. sec. 7206(2); (3) one count of willfully filing an income tax return which was false as to a material fact (petitioners' 1980 tax return) in violation of 26 U.S.C. sec. 7206(1); and (4) two counts of willfully failing to file income tax returns for 1981 and 1982 in violation of 26 U.S.C. sec. 7203.

In late 1987, Robert was found guilty on all 137 counts that he was charged with. On May 13, 1988, Robert was sentenced to 13 years imprisonment and fined $940,000 as a result of his convictions. Robert appealed the convictions relating to the tax shelters, but not the convictions for false tax return (for 1980) and for willfully failing to file tax returns (for 1981 and 1982). Robert's convictions were affirmed. United States v. Iles, 906 F.2d. 1122 (6th Cir. 1990).

_____

In general, and in the case of each of the arrangements described supra, Robert provided the initiating ideas and the force necessary to put the arrangements into effect, while Monica provided or oversaw the necessary administrative and technical work to carry out the arrangements.

For each of the years 1980, 1981, and 1982, respondent has shown by clear and convincing evidence that petitioners had an underpayment of income tax required to be shown on their joint tax return; the underpayment for each of these years was due to Robert's fraud.[23]

OPINION

Respondent contends that (1) petitioners underpaid their taxes for 1980 through 1982, (2) petitioners' underpayments for these years are due in whole or in part to Robert's fraud, and thus (3) Robert is liable for the fraud additions to tax under section 6653(b).  Robert contends that he never had any intent to deceive the Federal Government.

We agree with respondent.

_____

[23]     In the instant case we are not called upon to determine whether and, if so, then to what extent, any of these underpayments were due to Monica's fraud.  Supra note 3.  Any such fraud on Monica's part does not diminish Robert's fraudulent responsibility for the underpayments.

When respondent seeks to impose the additions to tax under section 6653(b),[24] respondent has the burden of proof.  To carry

---

[24]     Sec. 6653(b) provides, in pertinent part, as follows:

SEC. 6653.   FAILURE TO PAY TAX.

*       *       *       *       *       *       *

(b) Fraud.--

(1) In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.

(2) Additional amount for portion attributable to fraud.--There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601--

(A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and

(B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

For 1980 and 1981, the fraud addition to tax is provided for in sec. 6653(b), the first sentence of which is the same as the above-quoted sec. 6653(b)(1).

Par. (2) was added by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, and was effective for taxes the payment of which (determined without regard to any extension) is due after Sept. 3, 1982.  In the instant case, par. (2) is applicable to the additions to tax determined against petitioners for 1982.

(continued...)

this burden for a year, respondent must prove the following: (1) Robert has an underpayment of tax for that year, and (2) some part of that underpayment is due to Robert's fraud. Sec. 7454(a);[25] Rule 142(b); e.g., <u>Carter v. Campbell</u>, 264 F.2d 930, 936 (5th Cir. 1959); <u>Stone v. Commissioner</u>, 56 T.C. 213, 220 (1971); <u>Otsuki v. Commissioner</u>, 53 T.C. 96, 105, 106 (1969). Each of those elements must be proven by clear and convincing evidence. <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Parks v. Commissioner</u>, 94 T.C. 654, 663-664 (1990); <u>Hebrank v. Commissioner</u>, 81 T.C. 640, 642 (1983).

For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is

---

[24](...continued)
The later amendments of this provision by sec. 1503 of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742), by sec. 1015(b)(2)(B) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3569), and by sec. 7721(a) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89--Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant case.

As a result of OBRA 89, the revised fraud addition to tax now appears in secs. 6663 and 6651(f).

[25] SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER,
AND TRANSFEREE CASES.

(a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.

attributable to fraud.  E.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274.  In carrying this burden, respondent may not rely on Robert's failure to meet his burden of proving error in respondent's determinations as to the deficiencies.  E.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases cited therein.

Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958); McLaughlin v. Commissioner, 29 B.T.A. 247, 249 (1933).  A mere understatement of income does not establish fraud.  However, a pattern of consistent underreporting of income for several years is strong evidence of fraud.  Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memos. 1970-144 and 1970-37; Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100; Otsuki v. Commissioner, 53 T.C. at 108.

The issue of fraud is a factual question that is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v.

Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224.

In order to establish fraud as to Robert, respondent must show that Robert intended to evade taxes, which he knew or believed were owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). This intent may be inferred from circumstantial evidence, Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of Robert's explanations, Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986) (and cases therein cited), affg. T.C. Memo. 1984-601; Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951.

We consider first whether petitioners have an underpayment of tax for one or more of the years in issue, and then we consider whether any part of any underpayment is due to Robert's fraud.

## A.  Underpayments of Tax

For purposes of the fraud addition to tax, the term "underpayment" means a "deficiency", as defined in section 6211, except that the tax shown on the tax return is taken into account only if that tax return was filed on or before the last day prescribed for filing that tax return, determined with regard to any extension of time for that filing.  Sec. 6653(c)(1).  In the instant case, each of petitioners' 1980, 1981, and 1982 tax returns was filed after the extended due dates, and thus the tax shown on each of these returns is not taken into account in determining the existence or amount of an underpayment.  Secs. 6653(c)(1) and 6211(a)(1)(A).

On their late-filed tax returns, petitioners reported tax liabilities for each of the years 1980, 1981, and 1982.  These admissions (Fed. R. Evid. 801(d)(2)(A)) have not been effectively disputed by Robert.  In these circumstances, we conclude that respondent has thereby carried the burden of proving by clear and convincing evidence that petitioners have an underpayment of tax for each of the years in issue.  See, e.g., Bank of the West v. Commissioner, 93 T.C. 462, 468 (1989), and cases cited therein.  However, we examine into additional sources of underpayments for each of these years in order to assist in determining whether any parts of these underpayments are due to Robert's fraud.

Respondent's determinations in the notices of deficiency are based primarily on respondent's contention that petitioners had unreported income from money petitioners appropriated for their personal benefit from accounts that petitioners purported to manage as trustees or fiduciaries for others.  We proceed to consider the elements of this contention.

Table 1, drawn largely from a stipulated exhibit that Robert prepared, shows many of the business entities Robert was associated with between 1973 and 1983.  Robert also was the sole shareholder of Audio Research Analysts, Inc., and Super Swirl, Inc., during part of the period before the Court.

Table 1

| Business | Start Date | End Date (if applicable) | Activity | Legal Form | Robert's Interest |
|---|---|---|---|---|---|
| Associates | 1973 | Early 1980s | Bookkeeping & Tax Related | Sole Proprietorship | Owner |
| Robert Iles Computer Services, Inc. | July 1982 | | Computer Services | Corporation | 90% Shareholder |
| Consultants | 1979 | | Bookkeeping & Tax Return Preparation | Corporation | 75% Shareholder |
| Robert Iles, et al. | 1978 | 1980 | Computer Software | Partnership | 65% Partner[1] |
| The Cocoa Trusts | May 1980 | | Investment | Trusts | Trustee |
| SSC[2] | 1980 | 3-22-82 (Sold) | Financial Planning/ Chartered Rep. | Corporation | Sole Shareholder |
| SSI | 1980 | | Financial Planning/ Market Tax Shelters | S Corporation | 52% Shareholder (plus Monica's 24%) |
| Random Processing Service, Inc. | By 1980 | | Prepared Financial Reports | Corporation | Sole Shareholder[3] |
| Free Enterprise Trust | 1981 | | Investments | Trust | Trustee |
| Riago Revocable Trust | May 1981 | | Held all of Ps' Assets | Trust | Trustee |
| Lincoln American Securities | Aug. 1981 | | Securities Dealer | Corporation | Sole Shareholder |

| SSSI | Aug. 1982 | Broker-Dealer | Corporation | 52% Shareholder (plus Monica's 24%) |
|------|-----------|---------------|-------------|-------------------------------------|
| SSFMI | Aug. 1982 | Investment Adviser | Corporation | 52% Shareholder (plus Monica's 24%) |

[1] Robert states that he was a 52-percent partner. The partnership's 1979 tax return shows, and we have found, that Robert was a 65-percent partner. Supra H. Robert Iles, et al., note 12.

[2] Supra note 5 deals with the inconsistencies in the record as to when SSC was incorporated. Our finding is in accordance with the parties' stipulations. In addition, Robert's impression was that he sold SSC on Mar. 19, 1982; we have found that it was 3 days later. Supra N. Second Sale of Interest in Structured Shelters of Cincinnati.

[3] In an earlier case, based on the record in that case we had found that Random Processing Services, Inc., was Monica's corporation. In the instant case, the parties have stipulated, and we have found, that it was Robert's corporation. Supra note 6.

Respondent need not prove that petitioners did not have offsetting deductions. Once the Commissioner has presented clear and convincing evidence of unreported gross receipts, the taxpayer has the burden of coming forward with evidence as to offsetting deductions claimed by the taxpayer, even in criminal cases where the Government must prove a deficiency beyond a reasonable doubt. E.g., United States v. Hiett, 581 F.2d 1199, 1202 (5th Cir. 1978); United States v. Campbell, 351 F.2d 336, 338-339 (2d Cir. 1965); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956); see also Reiff v. Commissioner, 77 T.C. 1169, 1175 (1981).[26]

(1) 1980

---

[26] This rule is independent of the general rule applicable to civil cases, in which the taxpayer has the burden of proving entitlement to deductions before they may be allowed. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In the notice of deficiency for 1980, respondent determined that petitioners had unreported income from (1) the Cocoa Trusts, (2) the Monica Iles Shelters Trustee account, and (3) Random Processing Services, Inc.

In 1980, Monica wrote four checks totaling $100,000 to Robert from the Cocoa Trusts Escrow Fund. As our Findings of Fact show (supra H. Robert Iles, et al.), $90,000 of this total went to pay off a loan by a partnership in which Robert had a 65-percent interest. Monica testified, without contradictory testimony by Robert, that the primary motive was to remove the lender's security interest in assets in petitioners' personal residence and business office. Another check to Robert, for $6,000, was a commission payment. We have found that all $100,000 was 1980 income to Robert.

Pursuant to the parties' stipulation, we have found that in 1980, 38 checks totaling $45,631.78 drawn on the Monica Iles Shelters Trustee account were written to petitioners or on their behalf. We have found that the entire amount was income to petitioners. Supra K. Monica Iles Shelters Trustee Account.

Pursuant to the parties' stipulation, we have found that in 1980 five checks totaling $8,675 drawn on Random Processing Services' bank account were written to petitioners. We have found that the entire amount was income to petitioners. Supra J. Random Processing Services.

None of the foregoing amounts were reported on petitioners' 1980 tax return.

There is no indication of offsetting deductions or credits.

We conclude, and we have found, that respondent has shown by clear and convincing evidence that petitioners had an underpayment of tax for 1980.

(2) 1981

In the notices of deficiency for 1981, respondent determined that petitioners had unreported income from (1) the Cocoa Trusts, (2) the Monica Iles Shelters Trustee account, (3) Random Processing Services, Inc., (4) the FE Trust, (5) SSI, and (6) Maximum Management, and had unreported capital gain from the attempted sale of SSC.

Pursuant to the parties' stipulation, we have found that in 1981, seven checks totaling $29,300 were written to Robert from the Cocoa Trusts Escrow Fund. We have found that the entire amount was 1981 income to petitioners. Supra G. Cocoa Trusts.

Pursuant to the parties' stipulation, we have found that in 1981, 29 checks totaling $42,961.11 were drawn on the Monica Iles Shelters Trustee account to Robert or to third parties on petitioners' behalf. We have found that the entire amount was 1981 income to petitioners. Supra K. Monica Iles Shelters Trustee Account.

Pursuant to the parties' stipulation, we have found that a $1,000 check was drawn on the Random Processing Services' bank account to Monica. We have found that the entire amount was 1981 income to petitioners. Supra J. Random Processing Services.

We have found that, on December 17, 1981, $176,500 was withdrawn from the FE Trust's Southern Ohio Bank account, and shortly thereafter deposited in an escrow account to help fund Robert's appeal bonds. We have found that the entire amount was 1981 income to petitioners. Supra I. Lincoln American Securities.

Pursuant to the parties' stipulation, we have found that 37 checks and 1 wire transfer totaling $129,285.67 were drawn on SSI's Southern Ohio Bank account to petitioners or on their behalf. We have found that the entire amount was 1981 income to petitioners. Supra C. SSI and Its Chartered Representatives.

We have also found that two checks totaling $23,000, written to third parties on petitioners' behalf as performance bonuses for Robert, and one check for $25,000, with the notation "R. Iles personal draw", were drawn on SSI's Gradison Cash Reserves Account and are 1981 income to petitioners. Supra C. SSI and Its Chartered Representatives, and I. Lincoln American Securities.

We have found, based on SSI's books and records, that for its fiscal year ended July 31, 1981, SSI received, and deposited into the Structured Shelters bank account, $436,400 in gross

income, consisting of $374,000 from Chartered Representative fees, $8,900 from setup fees, and $53,500 from options. SSI's own fiscal 1981 subchapter S corporation tax return reported only $8,347 in gross income. We have found that SSI's undistributed taxable income for its fiscal 1981 was $108,238.39, and petitioners' 76-percent share of this is $82,261.18, which is taxable to petitioners for 1981. Supra C. SSI and Its Chartered Representatives.

Under the law then in effect, the undistributed taxable income of a subchapter S corporation for a taxable year was required to be included in the gross incomes of those persons who were shareholders of the corporation on the last day of that taxable year of the corporation, in proportion to those shareholdings. Sec. 1373(b). In general, undistributed taxable income was taxable income minus dividends distributed. See 1373(c).[27]

Our findings take into account the distributions that SSI made to its shareholders in SSI's fiscal year ended July 31, 1981. These distributions reduce the amount of SSI's fiscal 1981 undistributed taxable income. The distributions made later in

_____

[27] These rules were substantially revised effective for taxable years beginning after Dec. 31, 1982. Secs. 2 and 6(a) of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1697. The revisions (see especially secs. 1366-1368) do not apply to SSI's taxable years ending July 31, 1981, and 1982, and so do not affect the instant case.

1981 are 1981 income to petitioners but reduce the amount of SSI's undistributed taxable income for SSI's fiscal 1982.

We have found that, during 1981, Maximum Management wrote a $300 check to Monica, and wrote $5,225.92 in checks to Watkins to pay for Watkins' services in taking care of petitioners' children.  We have found that Maximum Management was Monica's sole proprietorship.  Supra L. Maximum Management.  The notices of deficiency refer to Maximum Management as one of "several business accounts, over which you exercised control." Petitioners' 1981 tax return, on which petitioners characterized Maximum Management as Monica's sole proprietorship, was filed more than 6 months after the notice of deficiency was sent to Monica.  Ordinarily, a personal diversion of funds from a sole proprietorship is not directly an income item to the proprietor-- however, such a diversion of funds may not be treated as an allowable deduction in calculating the sole proprietorship's net income or loss.  The net income or loss is then taken into account in determining the sole proprietor's adjusted gross income.  In the instant case, neither side attempted to reconstruct Maximum Management's income and deductions.  However, Monica testified that, the way Maximum Management was intended to operate, it "should have zero at the end".  Under the circumstances of the instant case, we treat the $300 check to Monica and the $5,225.92 in checks to Watkins as leading to a

1981 net profit of $5,525.92 to Maximum Management, which results in $5,525.92 additional 1981 income to petitioners. Although self-employment taxes are generally the liability of the taxpayer earning the income, under section 1.6017-1(b)(2), Income Tax Regs., the liability with respect to these taxes in the case of a joint return is joint and several. Thus, Robert, too, is liable for self-employment tax on the $5,525.92, even though Monica had the self-employment income.

We have so found, and we so hold.

As we have found, petitioners are taxable on $10,953 of 1981 long-term capital gain resulting from Robert's effort to sell an interest in SSC to Elliot. Supra M. First Sale of Interest in Structured Shelters of Cincinnati. In the notice of deficiency, respondent had determined that "the benefits of capital gains treatment are not available to you [Robert]." Petitioners, in their belated 1981 tax return, provided the information that the gain was $10,953, not the $10,000 determined in the notice of deficiency. Respondent concedes on brief that the income is long-term capital gain and that, as a result, 60 percent of the gain is excluded from income and so only $4,381 is includable in petitioners' 1981 adjusted gross income on account of this transaction. This is in accord with petitioners' 1981 tax return.

Thus, (1) petitioners' gain on the transaction is $953 more than the amount determined in the notice of deficiency, but (2) because of the 60-percent exclusion, petitioners' adjusted gross income from the transaction is $5,619 less than the amount determined in the notice of deficiency.

Petitioners failed to file a timely 1981 tax return. In fact, petitioners' 1981 tax return was filed after the notices of deficiency were issued in the instant case. In their late-filed 1981 tax return, petitioners acknowledged a tax liability of $5,501. Our findings show that petitioners' 1981 income subject to tax is far greater than what they reported on their 1981 tax return.

There is no indication of offsetting deductions or credits.

We conclude, and we have found, that respondent has shown by clear and convincing evidence that petitioners had an underpayment of tax for 1981.

(3) 1982

In the notices of deficiency for 1982, respondent determined that petitioners had unreported income from (1) Random Processing Services, Inc., (2) SSI, (3) the FE Trust, and (4) Maximum Management, and had unreported capital gain from the sale of SSC.

Pursuant to the parties' stipulation, we have found that in 1982 two checks totaling $15,000 were drawn on the Random Processing Services' bank account to Monica. We have found that

the entire amount was 1982 income to petitioners.  Supra J. Random Processing Services.

Pursuant to the parties' stipulation, we have found that 36 checks totaling $198,850 were drawn on SSI's Southern Ohio Bank account to petitioners or on their behalf.  We have found that the entire amount was 1982 income to petitioners.  Supra C. SSI and Its Chartered Representatives.

Pursuant to the parties' stipulations, we have found that in 1982 SSI paid $170,500 to SSSI as capital contributions to SSSI, and that SSI paid $59,237.27 to Finkelstein, Thompson, and Levenson as capital contributions to SSSI.

The parties did not stipulate the status of check no. 3205, written to Howard Blumenthal in the amount of $18,716, dated September 30, 1982.  However, the parties stipulated a memorandum, also dated September 30, 1982, by Monica to Basti. In this letter, Monica directs Basti to treat this check and two other checks as follows:

> These funds should be posted as contributed capital to the broker/dealer.  [SSSI]  * * * The capital contribution on behalf of Adrian Doyle, Robert Iles, Sr., and Monica Iles is 24%, 52% and 24% respectively.

Neither side has drawn our attention to anything in the record contradicting the clear import of this evidence, and we have not found any such contradicting evidence.  We conclude, and we have found, that respondent has shown by clear and convincing evidence that SSI paid $18,716 to Howard Blumenthal as a 1982 capital

contribution to SSSI.  We have found that in 1982 SSI paid

$14,000 to SSFMI as capital contributions to SSFMI.

All the foregoing contributions were on behalf of Robert,

Monica, and Doyle.  Robert held 52-percent interests in all three

corporations (SSI, SSSI, and SSFMI), and Monica and Doyle each

held 24-percent interests in all three corporations.  Respondent

concedes on brief, and we agree, that petitioners' income does

not include the 24 percent allocable to Doyle.  Thus, petitioners

had 1982 income in the amount of 76 percent (52 plus 24) of

$262,453.27 ($170,500 plus $59,237.27 plus $18,716 plus $14,000),

or $199,464.49, on account of SSI's 1982 payments of capital

contributions to SSSI and SSFMI on petitioners' behalf.  We have

so found.

> Respondent also asks us to conclude that--
>
> An additional nineteen SSI checks, totalling $2,408.00,
> represent payments for state registration fees or
> accounting services for SSSI or SSFMI, and are also
> contributions to the capital of SSSI or SSFMI.  (RPFF
> ¶¶ 255, 263, 264)  All of these amounts were payments
> by SSI to fund the personal acquisition by Robert Iles,
> Monica Iles, and Adrian Doyle of individual ownership
> interests in SSSI or SSFMI.

The cited proposed findings of fact direct our attention to one

$550 SSI check to Kolbinski and Kling, and two statements by

Kolbinski and Kling to SSSI for services rendered, in the amounts

of $300 and $750.  Respondent does not direct our attention to

anything in the record, including respondent's tables and

explanations, that would show that in 1982 SSI paid any debt of

SSSI or SSFMI, and we have not found anything in the record that would so show.

We conclude, and we have found, that petitioners' 1982 income on account of SSI's payments that constitute capital contributions to SSSI and SSFMI is $199,464.49.

We have found that in February 1982, Robert, as trustee for the Riago Trust, bought a Rolls Royce car for $79,000; that SSI paid the $79,000 purchase price; and that a month later SSI paid the $4,345 sales tax. We have found that the entire $83,345 was recorded on SSI's books as performance bonuses to Robert and is 1982 income to petitioners. Supra O. Rolls Royce.

We have found, based largely on SSI's books and records, that SSI's undistributed taxable income for its fiscal year ended July 31, 1982, is $1,413,319.10. This is after giving effect to deductions under section 1373(c) on account of more than $850,000 of SSI payments to or for the benefit of petitioners and Doyle during that fiscal year. We have found that petitioners' share of SSI's undistributed taxable income is $1,074,122.52; under section 1373(b), this is taxable to petitioners for 1982. Supra C. SSI and Its Chartered Representatives.

We have found that on February 5, 1982, Robert bought the Jet, acting individually and on behalf of the Rise Trust. It appears that the Rise Trust was merely a name used by Robert, Monica, and Doyle (in their by-then usual ownership interest

ratios of 52, 24, and 24, respectively) in which to own the Jet. We have found, pursuant to the parties' stipulations that in February 1982, SSI paid the $25,000 deposit on the Jet and FE Trust paid the $375,000 delivery installment on the Jet. A dispute then developed between the Jet's seller and the Rise Trust trio. It is not clear what eventually happened to the Jet. However, in March 1983, on a net worth statement petitioners submitted in connection with a loan application, petitioners claimed that their 76-percent interest in the Jet was worth $361,000. Also, on a net worth statement dated October 23, 1984, the Riago Trust claimed that its 76-percent interest in the Jet was worth $361,000. We have found that 76 percent of SSI's ($25,000) and FE Trust's ($375,000) 1982 payment--$304,000--is 1982 income to petitioners. Supra P. Saberliner Jet Aircraft.

We have found that, during 1982, Maximum Management wrote $6,049.81 in checks to Watkins to pay for Watkins' services in taking care of petitioners' children. For reasons set forth supra note 20, we conclude that three other checks, totaling $352.97 do not constitute 1982 income to petitioners. For reasons set forth in our analysis of petitioners' 1981 income from Maximum Management, supra, we conclude that Maximum Management had a 1982 net profit of $6,049.81, which results in $6,049.81 additional 1982 income to petitioners.

We so hold.

We have found that Robert sold SSC to Maerki.  In 1982, SSC paid $51,923.29 to SSI, of which $1,923.29 was interest.  In 1982, SSC paid $10,000 to Robert.  On their late-filed 1982 tax return, petitioners acknowledged $61,923 gain from this transaction, thereby conceding that they did not have any as-yet-unrecovered basis in SSC.  Also, petitioners do not contend that they should be taxable on only 76 percent of the SSI receipts, because of Doyle's 24-percent interest in SSI.  Respondent does not contend that petitioners had any additional income from the transaction and agrees with petitioners' long-term capital gain treatment of all but the interest component.  We conclude that the record clearly shows that $1,923.29 of SSC's payment to SSI was interest, and we have so found.  Supra N. Second Sale of Interest in Structured Shelters of Cincinnati.

We hold for respondent on this issue.

Petitioners failed to file a timely 1982 tax return.  In fact, petitioners' 1982 tax return was filed after the notices of deficiency were issued in the instant case.  In their late-filed 1982 tax return petitioners acknowledged a tax liability of $3,029.  Our findings show that petitioners' 1982 income subject to tax is far greater than what they reported on their 1982 tax return.

There is no indication of offsetting deductions or credits.

We conclude, and we have found, that respondent has shown by clear and convincing evidence that petitioners had an underpayment of tax for 1982.

(4)  Summary

We hold that petitioners had an underpayment of tax for each of the years 1980, 1981, and 1982.

We hold for respondent on this issue.

B.  Fraudulent Intent

As Robert's own listing of his business enterprises (supra table 1) suggests, and as our Findings of Fact amply confirm, Robert wove a marvelously tangled web.[28]

Throughout the period before us Robert created and managed or supervised entities designed to produce or manage cash-flows. Robert saw to it that he and Monica tapped into these cash-flows to satisfy their own personal standard-of-living needs, or their investment or legal defense needs, without regard to whether those "tap-ins" were legitimate expenditures by the entities whose cash was used.  In most instances it appears that the entities did not file Federal income tax returns.  Some entities were little more than misleading names on bank accounts.

---

[28]  Oh, what a tangled web we weave,
When first we practice to deceive!
    --Sir Walter Scott, Marmion, canto VI,
      stanza 17 (1808).

These freewheeling activities generated income subject to tax for petitioners. Robert understood enough about Federal income tax laws to understand this. Many of the entities he created were advertised as entities that could facilitate tax shelter investments, or that could prepare or assist in preparing Federal income tax returns. Yet Robert failed to report substantial amounts of the income thus generated. Petitioners filed their 1980 tax return about 3 months late. They did not file their 1981 and 1982 tax returns until after the notices of deficiency were issued, many years late. Even then, they failed to report substantial amounts of their income.

In his opening statement Robert claimed as follows:

As to the 1981, 1982, failure to file, under advice of counsel because of an ongoing fraud investigation by a Norman Heidleberger, it was -- the advice was given to us by counsel not to file income tax returns. That to file the tax return could adversely affect us in the way of a criminal investigation so therefore following counsel's advice we did not file.

Robert testified, but he did not repeat under oath this contention from his opening statement.

Monica testified as follows:

the advice from Mr. Moore was to clear up the criminal investigation which had already ensued before filing another tax return.

The following colloquy then occurred:

BY MR. HILL:

Q. Mrs. Iles, you testified as to advice from Mr. Moore with respect to the filing of tax returns and

that he advised that the return should not be filed until the criminal investigation was cleared up. When is it your recollection that Mr. Moore provided you with that advice?

A. Right after I moved to Florida. In fact, so it would be around September of '83.

However: (1) Petitioners' 1980 tax return was filed about 3 months after the extended due date; it was filed, petitioners wrote, "under duress due to summons and it will be amended"; and it was not amended during the 2 years between the filing of this tax return and the receipt of the asserted advice about not filing tax returns. (2) The asserted advice was not given until about 11 months after the extended due date for the 1981 tax return. (3) The asserted advice was not given until about 1 month after the extended due date for the 1982 tax return. Thus, even if we credit the accuracy of Monica's testimony as to the precise advice that petitioners understood they received,[29] this advice still would not explain petitioners' failure to timely file their tax returns for any of the years in issue. Nor would this advice affect petitioners' failure to report substantial

---

[29] The "Mr. Moore" referred to by Monica and respondent's counsel is John N. Moore, who filed the petition in the instant case and was petitioners' counsel herein until Apr. 29, 1991, when he withdrew from the case. None of the documents filed by Moore on petitioners' behalf in the instant case during the 3-1/2 years before Moore's withdrawal indicated that Moore had advised petitioners to delay filing any of their tax returns. Moore was not called as a witness in the instant case.

amounts of income on each of the tax returns they actually filed for the years in issue.

Based on the foregoing summary, our observations of Robert at and in connection with the trial, and the record as a whole, we conclude (and we have found) that respondent has shown by clear and convincing evidence that the underpayment of tax for each of the years in issue was due to Robert's fraud.

In order to take account of (1) the effect of petitioners' late-filed joint tax returns for 1981 and 1982 (see supra, our discussion of Phillips v. Commissioner, 86 T.C. 433 (1986), affd. on this issue and revd. on another issue 851 F.2d 1492, 1496-1498 (D.C. Cir. 1988)), (2) respondent's concessions, and (3) our determinations in the instant report that (a) certain items were not income to petitioners,[30] and (b) respondent carried the burden of proof in certain assertions that petitioners had income items in addition to those determined in the notices of deficiency,

Decision will be entered

under Rule 155.

---

[30]    We had dismissed Robert's case insofar as he had the burden of proof.  However, in addition to respondent's concessions, in a few instances the record clearly shows that the notices of deficiency were wrong.  Our determinations in the instant report in this regard supersede our previous order of dismissal.